Bid Procedures Hearing: March 15, 2011 at 10:00 a.m.
Objections Due:             March 9, 2011 at 4:00 p.m.

Bid Deadline:               April 9, 2011 at 4:00 p.m.
Auction Date:               April 11, 2011 at 1:00 p.m.

Sale Hearing:               April 14, 2011 at 10:00 a.m.
Objections Due:             April 7, 2011 at 4:00 p.m.

**SILVERMANACAMPORA LLP**
Attorneys for Kenneth P. Silverman, Esq.
  Chapter 7 Trustee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Anthony C. Acampora
Robert Nosek
Brett S. Silverman

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

In re:                                    Chapter 7

SPONGETECH DELIVERY SYSTEMS, INC.,        Case No. 10-13647 (SMB)

                    Debtor.
-------------------------------------------------------------------x

## THE TRUSTEE'S MOTION FOR ENTRY OF ORDERS (I) UNDER BANKRUPTCY CODE §§ 105 AND 363 AUTHORIZING AND APPROVING THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS TO A STALKING HORSE OFFEROR, SUBJECT TO HIGHER OR BETTER OFFERS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, SUBJECT TO THE TERMS AND CONDITIONS OF AN ASSET PURCHASE AGREEMENT, GRANTING RELATED RELIEF AND WAIVER OF STAY UNDER BANKRUPTCY RULE 6004; (II) ESTABLISHING SALE AND NOTICE PROCEDURES, INCLUDING APPROVAL OF A BREAK-UP FEE FOR THE STALKING HORSE OFFEROR, (III) APPROVING SETTLEMENT OF CLAIM FOR INVENTORY STORAGE COSTS; AND (IV) GRANTING RELATED RELIEF

**TO:    THE HONORABLE STUART M. BERNSTEIN
        UNITED STATES BANKRUPTCY JUDGE**

Kenneth P.  Silverman, Esq., the chapter 7 trustee of the estate of Spongetech Delivery Systems, Inc. (the "Debtor"), by his attorneys, SilvermanAcampora LLP ("SilvermanAcampora"), submits this motion (the "Motion") seeking (i) the entry of an order (the "Sale Order"), pursuant to sections 105 and 363 of title 11, United States Code (the "Bankruptcy Code"), authorizing the Trustee's sale (the "Sale") of certain of the Debtor's assets (collectively, the "Assets"), including, but not limited to, the Debtor's intellectual property and certain inventory, but excluding litigation claims, to Andrew Tzanides, or his designee or assign (the "Stalking Horse Offeror") for $500,000, subject to higher or better offers as may be tendered at a public auction sale, to be

held on **April 11, 2011, at 1:00 p.m.** (the "Auction"), free and clear of all liens, claims, encumbrances, security interests and other restrictions on transfer (collectively, the "Liens"), except for among other things, intellectual property rights belonging to third parties that is embedded in the Debtor's inventory and works in progress being sold (the "Excluded Liens"), with such Liens, if any, to attach to the proceeds of the Sale in the same amount, priority and validity as they currently exist; (ii) the entry of an order (the "Sale Procedures Order") approving: (A) certain procedures for the Auction and subsequent closing (the "Auction Procedures"); (B) the form, time and scope of notice of the Auction (the "Notice Procedures, and collectively with the Auction Procedures, the "Sale Procedures"); (C) a "break-up fee" of $25,000 for the Stalking Horse Offeror in the event it is not the Successful Bidder at the Auction (the "Break-Up Fee"), and certain overbid protections described herein, (D) fixing the date for a hearing before the Court to approve the Sale for **April 14, 2011, at 10:00 a.m.**, or as soon thereafter as counsel may be heard, and (E) waiving the stay provisions of Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (iii) approving, under Federal Rule of Bankruptcy Procedure 9019, the resolution of inventory storage fees being claimed against the Debtor by Dicon Technologies, LLC ("Dicon"); and (iv) granting related relief, and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Trustee has determined that the Sale of the Assets at this time is in the best interest of the Debtor's estate and its creditors.  The goal of the Sale is to maximize the value of these Assets through the Auction, to the party or parties submitting the highest or best offer received through the Auction and Sale process[1].  The Trustee has negotiated a $500,000 offer (the "Offer") for the Assets with the Stalking Horse Offeror which is embodied in an asset

---

[1] The party offering the highest or best bid on the Assets, as determined by the Trustee, at the conclusion of the Auction is hereafter defined as the "Successful Bidder" for the Assets.  The Successful Bidder may be the Stalking Horse Offeror, or another participant in the Auction.

BSS/860589.3/059228

purchase agreement (the "Asset Purchase Agreement"), a copy of which is annexed hereto as **Exhibit "A"**.

2.      Currently, the Debtor's estate is administratively insolvent.  The Sale, which will result in at least the amount of the Offer, if approved, will afford the Trustee to the ability to make a partial, interim distribution to holders of allowed chapter 7 and 11 administrative claims, and continue analyzing and investigating possible litigation claims that the Debtor's estate might have against third parties, for the benefit of the Debtor's creditors.  It will also provide the monetary means to conclude this case in a thorough, swift, and efficient manner.

## BACKGROUND

3.      The Debtor, a manufacturer and distributor of hydrophilic foam cleaning products designed for use in the home, on automotive and maritime vehicles, and for pets, is a Delaware publicly-held corporation.  In May of 2010, the United States of America filed a criminal complaint in the United States District Court for the Eastern District of New York charging the Debtor's Chief Operating Officer/Chief Financial Officer/Chief Accounting Officer and the Debtor's President/Chief Executive Officer with conspiracy to commit fraud and obstruction of justice.  On the same day, the United States of America filed a civil complaint against those two officers and several others, alleging, *inter alia*, that they were involved in a massive "pump and dump" scheme defrauding the Debtor's shareholders.

4.      Thereafter, on July 9, 2010, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  No schedules were filed by the Debtor at that time.

5.      By Order of the Court dated, July 19, 2010, and Notice of Appointment dated July 20, 2010, S. Gregory Hays ("Hays") was appointed as the chapter 11 operating trustee of the estate.  On August 3, 2010, by Notice of Withdrawal, Hays resigned as trustee.  By order dated August 4, 2010, Hays was discharged of his duties, and Kenneth P. Silverman, Esq., was

3

appeared as the Successor Operating Trustee.

6.      By Order of the Bankruptcy Court dated November 10, 2010, the Debtor's chapter 11 case was converted to a liquidation proceeding under chapter 7 of the Bankruptcy Code.  Thereafter, the Bankruptcy Court appointed the Trustee as the interim chapter 7 Trustee in the Debtor's case, he has duly qualified as permanent chapter 7 Trustee, and continues in that capacity.

7.      This Court has jurisdiction to hear this Motion under 28 U.S.C. §§ 157(a) and 1334, and the Order of Reference of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O). The statutory predicates for the relief sought herein are Bankruptcy Code § 105 and 363(b) and (f), and Bankruptcy Rules 2002 and 6004.  Additionally, the Debtor submits that this Motion and the accompanying documents are in conformity with General Order M-383.

**RELIEF REQUESTED**

8.      By this Motion, the Trustee seeks an order authorizing and approving the Sale of the Assets to the Stalking Horse Offeror for $500,000, subject to higher or better offers, free and clear of all Liens, with such Liens, if any, to attach solely to the proceeds from the Sale in the same amount, priority and validity as they as they currently exist, except for the Excluded Liens which will, if any exist, continue to encumber the Debtor's inventory and works in progress.  The selection of the Stalking Horse Offeror was the result of several months of a bid solicitation and review process conducted by the Trustee and his retained professionals, and the Asset Purchase Agreement was negotiated at arm's length for several weeks.  The Trustee also seeks approval of the Sale Procedures and the Dicon Stipulation (defined below).

4

**The Assets**

9.     The Assets include:  (i) the Debtor's Intellectual Property as defined in the Asset Purchase Agreement; and (ii) the Debtor's inventory wherever located, as defined and subject to the terms and conditions of the Asset Purchase Agreement, including the Excluded Liens under Section 8(u) of the that agreement.

10.     Certain of the Debtor's inventory is being stored and warehoused outside of Savannah, Georgia, in a facility being utilized by the trustee of Dicon, a former subsidiary of the Debtor.   The Trustee for the Debtor and Dicon's trustee are entering into a stipulation of settlement (the "Dicon Stipulation") which settles and releases any liens or claims in and to the inventory that might be held by Dicon for the sum of $15,000.  A copy of the proposed Dicon Stipulation is annexed hereto as **Exhibit "D"**.   Upon information and belief, Dicon asserts claims of more than $26,000 as of the date of this Motion.  By its terms, the Dicon Stipulation must be authorized and approved by the United States Bankruptcy Court for the Southern District of Georgia (the "Dicon Court").  The Asset Purchase Agreement is, in part, conditioned upon the entry of the Inventory Order by the Dicon Court.  The Trustee also seeks this Court's approval of the Dicon Stipulation in this Motion as part of the sale process.

**Bid Solicitation Process**

11.     Over the past several months, the Trustee engaged in an effort to solicit and negotiate offers to purchase the Assets.  During that time period, certain individuals and entities made offers to the Trustee for the Assets.  None of these offers, however, were deemed to be serious or viable.  In many cases, and prior to the Offer, those offerors sought to purchase the Assets and certain potential litigation claims possessed by the Debtor's estate.   Those offers were not presented in any formal manner, such as a letter of intent, and many times lacked basic terms such as purchase price.   The Trustee, with the assistance of his retained professionals, reviewed those offers and concluded that each was inadequate for one reason or

5

another. Notwithstanding the foregoing, as discussed below the Trustee intends to provide notice of the Offer to those parties that previously expressed interest in the Assets.

**The Trustee's Proposed Sale Procedures**

12.     The Trustee's Sale Procedures include the Auction Procedures comprised of the terms and conditions applicable to qualifying for and conducing the Auction and closing the Sale, as well as the Notice Procedures the Trustee seeks to utilize for the Auction. The proposed Sale Procedures, discussed below, are included in the proposed Sale Procedures Order, a copy of which is annexed hereto as **Exhibit "B"**.

A.     Auction Procedures

13.     The Trustee intends to conduct the Auction on **April 11, 2011 at 1:00 p.m.** The Auction will take place at the offices of SilvermanAcampora. Utilizing SilvermanAcampora's offices will reduce administrative costs of travel and time expended by the Trustee's retained professionals. The Auction will be governed by procedures approved by this Court (the "Auction Procedures").

14.     The Assets are being sold as a group pursuant to the terms of the Asset Purchase Agreement and will not be offered as separate lots. Furthermore, the Trustee is only selling the Assets listed on Exhibit "A" to the Asset Purchase Agreement, subject to the terms set forth in said agreement, but not selling any other of the Debtor's assets, including the Debtor's potential litigation claims.

15.     The Trustee also proposes the following procedures for use at the Auction:

(a)     The Assets will be offered for Sale in bulk. None of the Assets will be offered for sale in separate lots.

(b)     Only "Qualified Bidders" will be permitted to bid for the Assets.

(c)     To be a "Qualified Bidder" an individual or entity must submit to SilvermanAcampora, no later than two (2) business days prior to the Auction (the "Bid Deadline"): (i) a bid in writing including the

6

identity of such bidder and the name of the officer or authorized agent who will appear on behalf of such bidder; (ii) a good faith earnest money deposit by cashier's or certified check or wire transfer of immediately available funds in the amount of $55,000 (the "Overbid Deposit"); (iii) evidence, satisfactory to the Trustee, that the bidder has the financial ability to satisfy its bid in cash or by wire transfer; and (iv) evidence, satisfactory to the Trustee, that the bidder has the ability to close the Sale no later than three (3) business days after the entry of an order approving the Sale or after the entry of the Inventory Order, which ever is later in time.

(d)   The Assets will be sold to the Qualified Bidder submitting the highest or best bid, subject to the reasonable business judgment of the Trustee (the "Successful Bidder").

(e)   The full amount of the Overbid Deposit will be payable by cashier's check, certified check, or wire transfer of immediately available funds to be deposited with Trustee's counsel (SilvermanAcampora LLP), and will be nonrefundable in the event that the bid is the highest or best and is approved by the Court, notwithstanding whether the Successful Bidder is able to close the Sale.  The Overbid Deposit (or the Deposit already submitted by the Stalking Horse Bidder, together with the Overbid Deposit, the "Deposits") from the successful bidder will be applied as a credit against the purchase price paid by the Successful Bidder.  At the conclusion of the Auction and upon approval by the Court of the winning bid, and after the closing of the Sale, all Deposits made by bidders other than the Successful Bidder will be returned promptly.

(f)   Bids at the Auction must be for all cash, without financing or other contingencies.

(g)   The initial overbid must be at least $550,000 (the "Initial Overbid"), which is comprised of (1) the Offer; (2) the Break-Up Fee; and (3) an economic enhancement for the benefit of the Debtor's estate of $25,000.  All subsequent overbids must be at least $10,000 more than the Initial Overbid.  The Initial Overbid and subsequent overbids have been reasonably calculated to foster competitive bidding for the Assets.

(h)   The Successful Bidder must be prepared to close the Sale no later than three (3) business days following the entry of the order approving the Sale or the Inventory Order, which ever is later, the Debtor will seek  approval of the Court to close such the Sale notwithstanding the requirements of Bankruptcy Rule 6004(h).

(i)   If a Successful Bidder fails to close the Sale in accordance with the terms herein, it will forfeit its Deposit and the Assets will be sold to the bidder submitting the next highest or best bid (as

7

approved by the Court at the Sale Hearing).

16.     The Trustee reserves his right, in consultation with his retained professionals, to adjust the bidding increments if and when an Initial Overbid is made during the Auction in order to foster competitive bidding and achieve the highest and best price for the Assets.

17.     All parties-in-interest are urged to read the proposed Auction Procedures in their entirety for a complete description of all of the terms and conditions of the Trustee's proposed Auction process.  *See* Exhibit B.  All parties-in-interest are also urged to read the Asset Purchase Agreement, as the terms and conditions of the Sale are contained therein and will not be altered, other than by order of this Court or by written consent of the parties thereto.  *See* Exhibit A.

B.     Notice Procedures

18.     The Trustee proposes that notice of the Auction and the Auction Procedures be provided to:  (i) all known creditors of the Debtor; (ii) all shareholders of the Debtor's equity known to the Trustee as of the date of this Motion; (iii) counsel to the Stalking Horse Offeror; (iv) all parties having filed notices of appearance in the Debtor's case as of the filing of this Motion; (vi) the Office of the United States Trustee; and (vii) all parties who have previously expressed interest in purchasing the Assets (collectively, the "Service Parties").  Notice will be in the form of a copy of the Sale Procedures Order, including the Auction Procedures, as well as the exhibits to this Motion.  The Trustee may also undertake, at *de minimis* cost, to offer the Assets for sale under the proposed Auction Procedures on one or more websites, and/or through cost-effective advertising in one or more business opportunity periodicals or newspapers.

**STATUTORY PREDICATE FOR RELIEF REQUESTED**

**Sales Outside the Ordinary Course of Business**

19.     Bankruptcy Code §704 requires a chapter 7 trustee to, among other things

8

"collect and reduce to money the property of the estate for which such trustee serves . . . ." *See*

§704(a)(1).   Although such sales can be accomplished without order of the Court under certain

circumstances, a trustee has the discretion to seek approval of a sale under Bankruptcy Code §

363[2] and Bankruptcy Rule 6004 when that sale is outside of the ordinary course of the debtor's

business, or where the Trustee reasonably believes that an order is necessary to complete the

sale.   *See* 11 U.S.C. § 363(b).   In this case, the Stalking Horse Offeror has conditioned the

Asset Purchase Agreement on the issuance of an order to approve the Sale.   Moreover, the

facts and circumstances of this case support the request to proceed by order rather than merely

notice, which is permitted under Bankruptcy Code §102(1)(B)(i).   *See In re Engman*, 395 B.R.

610, 622, fn. 20 (Bankr. W.D. Mich. 2008).   Here, the Trustee requests to proceed by seeking

an order of the Court approving the Sale.

      20.      Bankruptcy Code § 363 provides, in relevant part, that "the trustee, after notice

and hearing, may use, sell, or lease, other than in the ordinary course of business, property of

---

[2]  Bankruptcy Code § 363 provides, in relevant part:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . .
>
> * * *
>
> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other that the estate, only if
>
> > (1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2)   such entity consents;
> >
> > (3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4)   such interest is in bona fide dispute; or
> >
> > (5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §§ 363 (b)(1) and (f).

BSS/860589.3/059228

the estate." 11 U.S.C. §363(b)(1).  Although Bankruptcy Code § 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, the Second Circuit, in applying this section, has required that it be based upon the sound business judgment of the trustee.  *See e.g. Committee of Equity Security Holders v. Lionel Corp.  (In re Lionel Corp)*., 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1993); *In re Thomson McKinnon Securities, Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y. 1990).

21.     Sales under Section 363(b) may be done by private sale or public auction". S*ee* Fed. R. Bankr. P. 6004(f)(i).  The terms of such sale are also generally within the sound discretion of the trustee.  *See e.g. In re Ionosphere Clubs, Inc.*, 100 B.R. 670 (Bankr. S.D.N.Y. 1989) (sale of debtor's airline shuttle assets approved where representing the exercise of independent good faith and non-coerced business judgment by the debtor, the debtor articulated a compelling business reason for the sale and the price represented fair value).

22.     As recognized by the Second Circuit in *Lionel*, *supra*, a court may approve a motion to sell assets under Bankruptcy Code § 363 after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application. In fact, "the sale of a going concern often fulfills the 'fundamental purpose of reorganization' by allowing the new owners to continue to operate the debtor's business and employ the debtor's former employees".  *See In re Spa Chakra*, 2010 WL 779270, *3-4 (Bankr. S.D.N.Y. March 5, 2010) (*quoting N.L.R.B.  v. Bildisco & Bildicso*, 465 U.S. 513, 528 (1984)).

23.     Here, should he be the Successful Bidder, the Stalking Horse Offeror seeks to use the Debtor's Intellectual Property to begin manufacturing, marketing and distributing products similar in nature to the Debtor's products.  Moreover, upon information and belief, the Stalking Horse Offeror intends to employ certain of the Debtor's former employees who have

10

been out of work since August 2010.[3]  Furthermore, the Stalking Horse Offeror will utilize the inventory he acquires as part of the Sale to foster sales for his products, thus creating enough lead time to be able to initiate inventory production with his new manufacturing partners.  Upon information and belief, the Stalking Horse Offeror has retained Steven Y. Moskowitz, the Debtor's former chief operating officer, as a consultant.  Mr. Moskowitz has not been involved in the Trustee's meetings or negotiation with the Stalking Horse Offeror.

24.     The Trustee has concluded that he should promptly sell the Assets because, among other reasons: (i) the Assets are declining in value as they continue to remain unused; (ii) certain of the inventory is laying dormant in warehouses that are continually accruing administrative expenses; and (iii) in order to generate profits from the Assets, a substantial infusion of time and capital will be required in order to restart the manufacturing, marketing, and distribution of products similar to those formerly sold by the Debtor.  Thus, in order for any purchaser to be able to benefit from the use of the Assets, the Assets need to be sold as quickly as possible in order to maximize the possible return.

25.     Moreover, the Trustee believes that a prompt sale of the Assets is in the best interest of creditors because the Sale would enable the Trustee to be able to, among other things, make an interim distribution to the holders of allowed chapter 7 and chapter 11 administrative claims and fund potential litigation of claims for the benefit of the Debtor's creditors.     Finally, it is the Trustee's understanding that the Sale will assist certain of the Debtor's former employees by putting them back to work with the Stalking Horse Offeror and his new venture.

**Sale of the Assets by Public Sale**

26.     The Trustee has determined that the Sale of the Assets by way of public auction

---

[3] The Asset Purchase Agreement is silent to the employment of former employees of the Debtor by the Successful Bidder.  It is not necessary for the Successful Bidder to hire any of the Debtor's former employees.  Upon information and belief however, the Stalking Horse Offeror has approached certain of the Debtor's former employees (not officers or directors, except for Mr. Moskowitz), to assist him in re-establishing the Debtor's business.

11

will enable him to ascertain and generate the highest or best offers for the Assets, thus maximizing the value of the Assets for the benefit of the Debtor's creditors. That sale format also presents the most transparent method in which to conduct the Sale, and gives all interested parties equal opportunity to participate in the Auction.

**Sale Procedures and Notice Procedures**

27.     The Trustee submits that the proposed Sale Procedures for the Auction are appropriate and necessary, and will enable him to realize the maximum value from the Assets for as many of the creditors as possible. Similar procedures are utilized frequently in chapter 7 liquidation sales and have been found to produce maximum results. Therefore, it is in the best interests of the Debtor's estate to proceed with the Sale under the proposed Sale Procedures.

28.     Good cause exists to approve the proposed Sale Procedures because they will promote competitive bidding, streamline the Auction, and ensure that bidders have the financial ability to purchase the Assets, all of which will enable the Trustee to realize the maximum value from the Sale of the Assets.

29.     As discussed above, the Assets have been available for purchase since August 2010. The Trustee has attempted to market the Assets through word of mouth, and he has entertained numerous discussions concerning the sale of certain of the Debtor's assets including the sale of potential litigation claims. The former shareholders of the Debtor have had ample opportunity to put together an offer for the Assets, however, only a few have proposed offers, which were either grossly inadequate or without merit. Other than the Offer, none of those other discussions or proposals materialized into viable offers or letters of intent. Thus, the Trustee believes that further marketing efforts beyond those already undertaken or as proposed herein would incur more expenses than are warranted for this administratively insolvent estate.

30.     The Trustee proposes that notice of his intent to sell the Assets be provided to

12

the Service Parties (as defined below), which shall include, but not be limited to, all creditors and shareholders known to the Trustee as of the date of this Motion, and other parties previously expressing an interest in acquiring Assets. The Trustee believes that such notice to the Service Parties is sufficient under these circumstances to establish the highest or best value for the Assets.

31.    Furthermore, the Trustee proposes that all competing offers be submitted to his attorneys, SilvermanAcampora, no less than forty-eight (48) hours prior to the Auction. Competing offers must comply with the Auction Procedures set forth herein, including but not limited to the presentment of a Deposit in readily available funds, or upon such other terms acceptable to the Trustee in his sole discretion, to promote competitive bidding to maximize the value of the Assets. Moreover, the Trustee reserves the right, in his sole discretion, to accept offers for the Assets subsequent to the Bid Deadline and with such terms as he deems acceptable.

**Sale of the Assets Free and Clear of Encumbrances**

32.    Bankruptcy Code § 363(f) permits the sale of assets to be free and clear of liens, claims and interests of an entity in such property under certain circumstances, if: (a) applicable state law will permit the sale; (b) such entity consents; (c) the price at which the property is being sold exceeds the liens, claims and interests; (d) the security interest in the assets is disputed; or (e) the entity with an interest in the asset being sold could be compelled in a legal or equitable proceeding to accept a money satisfaction of its interest in and to the property. *See* 11 U.S.C. §363(f).

33.    The Trustee believes that (a) all parties holding Liens against the Assets will consent; and (b) regardless, the Purchase Price is greater than the total amount of any and all Liens that might be asserted against the Assets.

34.    Certain of the inventory being sold in the Sale is subject to intellectual property

BSS/860589.3/059228

rights of third parties that have become embedded in such inventory and works in progress. The Debtor, however, no longer holds valid intellectual property licenses to use such rights or sell product embedded with such intellectual properties. Thus, the Trustee requires in the Asset Purchase Agreement that any such inventory or works in process will be sold by the Trustee and transferred to the buyer subject to the Excluded Liens (collectively, the "Licensing Rights"). All potential purchasers must be aware that the inventory and works in progress are being sold "as is" "where is" with all of the Licensing Rights attached thereto.

35.    Certain of the inventory is also subject to certain claims and liens held by Dicon. As described above, the Trustee has entered into a stipulation to release those claims and liens held by Dicon (the "Dicon Stipulation"). All potential purchasers should be aware that the Asset Purchase Agreement and the Closing are expressly conditioned upon the entry of the Inventory Order. In the event that the Inventory Order is entered by the Dicon Court and approved by this Court, the Successful Bidder will be bound by the terms of both the Inventory Order and the Asset Purchase Agreement with regard to possession and removal of the inventory being held by Dicon. Upon entry of the Inventory Order by the Dicon Court, Dicon will have consented to the sale of the inventory free and clear of its Liens.

36.    Based on the foregoing, the Trustee believes that it will be able to satisfy the requirements of Bankruptcy Code section 363(f) at the time of the Sale Hearing.

37.    As set forth above, the Trustee respectfully submits that compelling business justification exists for the approval of that part of the Motion seeking to sell the Assets. Thus, the Trustee respectfully requests that the Court authorize and approve the Sale as set forth in, contemplated by, and resulting from, the Sale Procedures. Consequently, the Trustee submits that the foregoing standard pursuant to Bankruptcy Code § 363 has been satisfied in the instant matter, and respectfully requests the Court authorize and approve the Sale of the Assets at this

14

time.

38.    Furthermore, the Trustee intends to seek confirmation of the Successful Bidder at the Sale Hearing.  Accordingly, the Trustee requests that the Court authorize the Sale of the Assets to the Successful Bidder, whether or not the highest or best bidder is the Stalking Horse Offeror.

**Break-Up Fee to the Stalking Horse Offeror**

39.    The Trustee also requests authority to authorize the Break-Up Fee to the Stalking Horse Offeror, should he not be, and the Sale is closed with another, Successful Bidder, as outlined in the Asset Purchase Agreement and as set forth herein.  The Stalking Horse Offeror has requested $25,000 as the amount for the Break-Up Fee to cover costs of due diligence and as incentive to be the Stalking Horse Offeror.  The requested Break-Up Fee is the product of arm's-length negotiations, and not offered to any insiders of the Debtor.  *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

40.    Here, the Break-Up Fee sought is:  (i) limited in amount; (ii) within the range of reasonableness for transactions of this type under prevailing case law in this Circuit; and (iii) fair and reasonable in light of all of the circumstances of this case, including the relation between the requested Break-Up Fee and the Offer price.  *See e.g. In re Metaldyne Corp.*, 409 B.R. 661, 671 (Bankr. S.D.N.Y. 2009).

41.    Additionally, the Trustee has already contemplated and built the Break-Up Fee into the Initial Overbid.  Therefore, the Successful Bidder (if not the Stalking Horse Offeror) will actually be funding the cost of the Break-Up Fee, plus the additional economic enhancement.  It follows that because (a) the Debtor's estate will not be incurring the costs for the Break-Up Fee, (b) the Break-Up Fee was a material inducement for the Stalking Horse Offeror to enter into the Asset Purchase Agreement, and (c) the Offer is subject to higher or better offers at the Auction,

15

BSS/860589.3/059228

the Offer not only establishes a floor value for the Assets, but also preserves the upside potential value as well, the Trustee believes that it is both appropriate and necessary.

42.     Therefore, Trustee seeks this Court's approval of the Break-Up Fee.

**Preservation of Debtor's Books and Records**

43.     Although the Trustee proposes to sell substantially all of the Debtor's assets in the contemplated Sale, he will retain, for a reasonable period of time, the Debtor's books and records, so that he will be able to administer this case.[4]

**Waiver of 14-Day Stay Under Rules 6004(h) and 6006(d)**

44.     Bankruptcy Rule 6004(h), provides that, unless the court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code § 363 are automatically stayed for 14 days after entry of the order. *See* Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See 1999 Advisory Committee Notes* to former Fed. R. Bankr. P. 6004(g).[5]

45.     Given the circumstances of this case and the need to swiftly transfer ownership of the Assets to the Stalking Horse Offeror or other Successful Bidder, the Trustee requests that the provisions of Rule 6004(h) should be waived, and any order approving the Sale of the Assets should be effective immediately upon entry by the Court.

**Approval of Dicon Stipulation under Rule 9019**

46.     Pursuant to the terms of the Dicon Stipulation, Dicon is releasing its claims in and

---

[4] To date the Trustee's efforts to assemble a complete set of books and records has been thwarted.  Notwithstanding the suspect manner in which the Debtor maintained its books and records, the Trustee's ability to assemble a complete and accurate set of books and records has also been frustrated by the criminal and civil investigations into certain of the Debtor's former directors and officers.  Therefore, the books and records that the Trustee does maintain will be reproduced for the Successful Bidder upon request pursuant to the terms of the Asset Purchase Agreement.

[5]   Subdivision (g) of Rule 6004 was re-designated subdivision (h) as part of the 2008 amendments to the Federal Rules of Bankruptcy Procedure.

16

to the Inventory subject to the terms of the Dicon Stipulation, and in consideration the Trustee shall remit to Dicon the sum of $15,000, at or after the Closing in accordance with the terms of the Asset Purchase Agreement. ***Additionally, if the Sale fails to Close for whatever reason, the Trustee shall abandon the Inventory to Dicon and waive any and all claims, rights, or other interests of any kind in and to such Inventory, pursuant to Bankruptcy Code § 554(a).*** The Trustee submits that the notice requirement of Bankruptcy Rule 6007 has been satisfied and is sufficient under the circumstances.

47.     Rule 9019 of the Federal Rules of Bankruptcy Procedure governs the approval of compromises and settlements, and provides in relevant part as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indentured trustees as provided in Rule 2002 and to any other entity as the court may direct. FED R. BANKR. P. 9019(a).

48.     In approving the compromise and settlement, the Bankruptcy Court is required to make an "informed and independent judgment" as to whether the compromise and settlement is fair and equitable based on an:

> educated estimate of the complexity, expense and likely duration of [any] litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process, in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425, *reh'g denied*, 391 U.S. 909 (1968*);*

49.     The factors to be considered by the Court in determining whether to approve a compromise or settlement include:

> (i)     the balance between the litigation's possibility of success and the settlement's future benefits;

17

BSS/860589.3/059228

(ii)    the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

(iii)    the paramount interest of the creditors, including each affected class' relative benefits, and the degree to which creditors do not object to or affirmatively support the proposed settlement;

(iv)    whether other parties in interest support the settlement;

(v)    the competence and experience of counsel supporting the settlement; and

(vi)    the extent to which the settlement is the product of arm's length bargaining.

*In re Stone Barn Manhattan LLC,* 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) *(citing In re Iridium Operating LLC,* 478 F.3d 452, 462 (2d Cir.2007).

50.    Regardless of whether the Trustee could avoid paying storage costs to the Dicon estate, the costs to engage in litigation to do so would severely erode, if not surpass, the $15,000 settlement sum. On the other hand, the Dicon Stipulation avoids any litigation at a savings to the Debtor's estate of almost 43%. Because storage costs would continue to accrue during any litigation, if the Trustee were to be unsuccessful, the storage costs could be even more. Furthermore, the Dicon Inventory is a substantial part of the Assets being sold and the Stalking Horse Offeror was unwilling to purchase the Dicon Inventory without a resolution of the storage costs issue. Thus, the Dicon Stipulation is a integral part of the Sale. As discussed above, the proceeds from the Sale will provide a direct benefit to the Debtor's estate and its creditors where none currently exists. Although the Debtor and Dicon are not arm's length entities, their respective chapter 7 trustees are arm's length, with both sides represented by experienced, competent bankruptcy counsel.

51.    Based on the foregoing, the Trustee submits that the terms of the Settlement fall above the lowest rung of reasonableness and his business judgment on this issue is sound.

BSS/860589.3/059228

52.    Therefore, the Trustee respectfully requests that this Court approve the Dicon Stipulation.

## NOTICE PROCEDURES

53.    The Trustee requests that the Court schedule a hearing (the "Hearing") on shortened notice, to approve the portion of the Motion regarding the Biding Procedures, as soon as possible in order to reduce its recurring administrative expenses.  The Court has already scheduled other matters in this case for hearing on March 15, 2011 at 10:00 a.m., and thus, in the interests of judicial economy and Trustee's desire to reduce administrative costs to the Debtor's estate, the requests that the Court hold the Sale Procedures Hearing on March 15, 2011.

54.    Rule 2002 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that:

> (a)    Twenty-one-day notices to parties in interest.  Except as provided in subdivisions (h), (i), (l), (p), and (q) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of:
>
> * * *
>
> (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice;

Fed. R. Bankr. P. 2002(a) (2); see also Fed. R. Bankr. P. 9006(c)(permitting the shortening of time periods for notice under Bankruptcy Rule 2002).

55.    The Trustee shall also serve the Scheduling Order, Notice of Hearing and the Motion with all annexed Exhibits, via overnight carrier on (a) the Office of the United States Trustee, (b) counsel to the Stalking Horse Offeror, Rabinowitz, Lubetkin & Tully, LLC, Attn: Jay L. Lubetkin, (c) all parties that have properly served and filed Notices of Appearance in the Debtor's case, and (d) counsel to the Dicon Trustee (collectively, the "Special Service Parties").

19

56. The Trustee shall also serve only the Scheduling Order, Notice of Hearing and the proposed Bidding Procedures by first class mail upon all known creditors and parties that have filed a proof of claim in the Debtor's Case (the "Service Parties").

57. As additional notice, the Trustee shall also send the Scheduling Order, Notice of Hearing and Motion with all Exhibits by electronic mail upon those shareholders that the Trustee has electronic mail addresses for, and to all other interested parties, by posting the same on the website the Trustee maintains for the Debtor's estate, www.spongetechtrustee.com (collectively, the "Shareholders" together with the Special Service Parties and the Service Parties, the "Notice Parties").

58. Based on the foregoing, the Trustee requests that the Sale Procedures Hearing be held on **March 15, 2011 at 10:00 a.m**. That will provide the Notice Parties at least ten (10) days to review the Sale Procedures.

59. As discussed above, the Assets have been available for purchase since August 2010. The Trustee submits that the notice of the Auction and the proposed Sale Procedures to the Notice Parties described above is sufficient under these circumstances.

60. The aforementioned notice is being provided by the Trustee pursuant to Bankruptcy Rules 2002(a)(2)[6], 6004(a) and (c) and 9006(c)(1), and by virtue of the foregoing,

---

[6] Bankruptcy Rules 2002(a) provides, in relevant part, that:

    (a) Twenty-Day Notices to Parties in Interest. Except as provided in subdivisions (h), (i) and

    (1) of this rule, the clerk, or some other person as the court may direct, shall give the Debtor, the Trustee, all creditors and indenture trustees not less than 20 days notice by mail of

    * * *

    (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice;

Fed. R. Bankr. P. 2002(a) (2); *see also* Fed. R. Bankr. P. 9006(c).

BSS/860589.3/059228

notice of the Auction and the Sale Hearing will each be given on no less than twenty-five (25) days.

61. The Trustee further submits that the time afforded for such notice is reasonable and permissible pursuant to Bankruptcy Code §§ 102, 105, 363(b), (f), and (m) and Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, and 9019.

## CONCLUSION

62. The Stalking Horse Offeror has entered into the Asset Purchase Agreement as a result of extensive arm's-length negotiations with the Trustee. Other of the parties that the Trustee had solicited bids from may decide to bid at the Auction. Consequently, the Trustee anticipates that the Successful Bidder will be acting in good faith when bidding on the Assets, and thus, is entitled to the protections of a good faith purchaser under Bankruptcy Code § 363(m).

63. Based upon the foregoing, the Sale of the Assets, as outlined herein, to the Successful Bidder, is not only an exercise of the Trustee's sound business judgment, but is in the best interests of the Debtor, its estate, and its creditors, and thus, should be approved in all respects.

64. No previous motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Trustee respectfully requests that this Court grant the Motion and:

(i) enter the Sale Order, a form of which is annexed hereto as **Exhibit "C"**, which also includes approval of the Dicon Stipulation: (A) authorizing and approving the Debtor's proposed Sale of the Assets to the Successful Bidder, free and clear of all Liens, with such Liens, if any, except for the Excluded Liens, to attach to the proceeds of sale in the amount and priority as they currently exist; and (B) granting related relief;

(ii) enter the proposed Sale Procedures Order, a form of which is annexed hereto

BSS/860589.3/059228

as **Exhibit "B"**: (A) approving the Auction Procedures; (B) approving the Break-Up Fee as outlined in the Asset Purchase Agreement; (C) fixing the date for the Sale Hearing on **April 14, 2011 at 10:00 a.m.**, or as soon thereafter as the movant may be heard; (D) approving the Notice Procedures; and (E) granting related relief; and

      (iii)    grant such further relief as this Court deems proper.

Dated: Jericho, New York
      March 4, 2011

      **SILVERMANACAMPORA LLP**
      Attorneys for Kenneth P. Silverman, Esq.,
       Chapter 7 Trustee


      By:   s/Anthony C. Acampora       
          Anthony C. Acampora
          Robert D. Nosek
          Brett S. Silverman
      100 Jericho Quadrangle - Suite 300
      Jericho, New York 11753
      (516) 479-6300

BSS/860589.3/059228