# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**KENNETH P. SILVERMAN, ESQ., AS CHAPTER 7 TRUSTEE
OF SPONGETECH DELIVERY SYSTEMS, INC.**

**AND**

**ANDREW TZANIDES AND CHAO JIANG, OR HIS DESIGNEE/NOMINEE**

**MARCH 3, 2011**

# TABLE OF CONTENTS

1.  DEFINITIONS ..............................................................................

2.  BASIC TRANSACTION.....................................................................

    (a)    Purchase and Sale of Assets........................................................
    (b)    Purchase Price .......................................................................
    (c)    Additional Consideration..............................................................
    (d)    The Closing ...........................................................................
    (f)    Deliveries at the Closing ............................................................

3.  REPRESENTATIONS AND WARRANTIES OF SELLER....................................

    (a)    Authorization of Transaction......................................................
    (b)    Title to Assets........................................................................
    (c)    Survival ...............................................................................

4.  REPRESENTATIONS AND WARRANTIES OF BUYER .....................................

    (a)    Authorization of Transaction......................................................
    (b)    Brokers' Fees ........................................................................
    (c)    Certain Taxes ........................................................................
    (d)    Survival ...............................................................................

5.  CONDITIONS TO OBLIGATION TO CLOSE. ..............................................

    (a)    Conditions to Obligation of Buyer ...............................................
    (b)    Conditions to Obligation of Seller ................................................

6.  SELLER'S EXCUSE OF PERFORMANCE; RETURN OF BUYER'S DEPOSIT. ..................

7.  BUYER PROTECTIONS........................................................................

8.  MISCELLANEOUS.............................................................................

    (a)    "AS IS" TRANSACTION .............................................................
    (b)    No Third Party Beneficiaries.......................................................
    (c)    Entire Agreement ....................................................................
    (d)    Successors and Assignment ........................................................
    (e)    Counterparts .........................................................................
    (f)    Headings...............................................................................
    (g)    Notices; Business Days.............................................................
    (h)    Governing Law .......................................................................
    (i)    Amendments and Waivers ..........................................................
    (j)    Severability...........................................................................

(k)     Expenses ...........................................................................................................................
(l)     Construction .......................................................................................................................
(m)     Incorporation of Exhibits ...................................................................................................
(n)     Submission to Jurisdiction .................................................................................................
(o)     WAIVER OF JURY TRIAL....................................................................................................
(p)     Termination of Covenants, Representations, and Warranties .........................................
(q)     No Impediment to Liquidation ............................................................................................
(r)     Access to Premises Prior to Closing .................................................................................
(s)     Diligent Prosecution of Sale Motion ..................................................................................
(t)     Deadline to Obtain Sale Order............................................................................................

9.      DELIVERY OF DATA AND ACCESS TO DEBTOR'S BOOKS AND RECORDS.............

## EXHIBITS AND SCHEDULES AND ANNEXES

### EXHIBITS

| | | |
|---|---|---|
| Exhibit A | — | Sale Order |
| Exhibit B | — | Form of Bill of Sale |
| Exhibit C | — | Bid Procedures Order |
| Exhibit D | — | Personal Property Schedule |
| Exhibit E | — | Inventory Release Agreements |
| Exhibit F | — | Confidentiality Agreement |
| Exhibit G | — | Easter Seals Inventory Release Agreement (if applicable) |

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of March 3, 2011 (this "Agreement"), by and between Kenneth P. Silverman, Esq. (the "Trustee"), as chapter 7 trustee of the estate of Spongetech Delivery Systems, Inc. ("Spongetech" or the "Debtor") and Andrew Tzanides and Chao Jiang, his designee or nominee ("Buyer"). Buyer and Seller are also referred to herein individually as a "Party" and collectively, as the "Parties."

I.      The Debtor owns and formerly operated a business engaging in the manufacturing and distribution of cleaning products designed for the home, automobile and pets (the "Business").

II.     On July 9, 2010 (the "Filing Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11, of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to which that court assigned case number 10-13647 (SMB).

III.    By Order of the Bankruptcy Court dated July 19, 2010, the Debtor was removed from possession of its property and management of its Business, and S. Gregory Hays, Esq. ("Hays") was appointed the chapter 11 operating trustee of the Debtor. On August 3, 2010, by Notice of Withdrawal, Hays resigned his position as chapter 11 operating trustee of the Debtor.

IV.     By Order of the Bankruptcy Court dated August 4, 2010, Hays was discharged of his duties as chapter 11 operating trustee of the Debtor, and Kenneth P. Silverman, Esq. (the "Trustee"), was appointed as the successor chapter 11 operating Trustee of the Debtor.

V.      By Order of the Bankruptcy Court dated November 10, 2010, the Debtor's chapter 11 case was converted to a liquidation proceeding under chapter 7 of the Bankruptcy Code. Thereafter, the Bankruptcy Court appointed the Trustee as the interim chapter 7 Trustee in the Debtor's case, he has duly qualified as permanent trustee, and continues in that capacity.

VI.     The Trustee is charged with maximizing the value of the Debtor's assets for the benefit of the estate, whether by liquidation or assumption and assignment.

VII.    The Buyer desires to purchase from the Trustee, as seller (hereinafter, the "Seller"), and Seller desires to sell to Buyer, substantially all of the Debtor's assets relating to the Business.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

1.      Definitions. "Acquired Assets" means all right, title, and interest in and to substantially all of the Debtor's assets related to the Business "as is" "where is", as defined on Exhibit "D" annexed hereto, which includes: (i) the Debtor's tangible personal property, if any,

except for any computers, servers, or hard drives or like storage medium; (ii) certain inventory and, if any, works in progress and raw materials, of the Debtor, wherever located whether or not subject to any Intellectual Property Rights (as defined below) owned by third parties; (iii) the Acquired IP (as defined below); (iv) Data; and (v) all other property owned by the Debtor or in which the Debtor possessed an interest, provided, however, that Acquired Assets do not include any Excluded Assets (as defined below).

"Acquired IP" means all Intellectual Property and Intellectual Property Rights (including the goodwill of Spongetech) owned by Spongetech as of the Closing (including the right to use the name "Spongetech® Delivery Systems, Inc." and other trade names, trade marks, and domain names, including, without limitation, those registered, unregistered, and pending registration, as defined on Personal Property Schedule annexed hereto as Exhibit D, included in the Acquired Assets).

"Affiliate" of any particular Person means any other Person (as defined below) controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

"Alternative Transaction" means an agreement entered into by Seller with the successful bidder at the Auction pursuant to which Seller agrees to sell or otherwise transfer any of the Acquired Assets used in connection with the Business to a third party other than Buyer.

"Assumed Liabilities" means only the Storage Fees and the IP Fees, as those terms have the meanings set forth in Section 2(c) herein, and no other liabilities of the Debtor.

"Auction" shall mean the auction of the Acquired Assets scheduled to take place, pursuant to an Order of the Bankruptcy Court.

"Bankruptcy Code" has the meaning set forth in the second recital above.

"Bankruptcy Court" has the meaning set forth in the second recital above.

"Bid Procedures Order" has the meaning set forth in Section 5(a)(i) herein.

"Bill of Sale" has the meaning set forth in Section 2(e).

"Business" has the meaning set forth in the first recital above.

"Buyer" has the meaning set forth in the preamble above.

"Cash" means cash and cash equivalents (including marketable securities and short term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements (as defined below).

"Claim" means any action, claim, lawsuit, demand, suit, charge, complaint, inquiry, hearing, investigation, notice of a violation or noncompliance, litigation, proceeding, arbitration, appeal or other dispute, whether civil, criminal, administrative or otherwise, including but not limited to any "claim" as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2(d).

2

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid Requirements" has the meaning set forth in Section 7 herein.

"Confidentiality Agreement" refers to the certain agreement executed on January ___, 2011, which has been annexed hereto as **Exhibit "F"**.

"Data" means all information and data (in any form or medium stored) to the extent in the possession of the Trustee concerning Spongetech and its Business provided to, collected and organized by the Debtor and its Affiliates (or any third party), regardless of the source, including information and data concerning, provided by or related to customers and shareholders of the Debtor, including: (i) names, email addresses and mailing addresses; (ii) information and data related to sales and transaction history, manner and frequency of access and contacts, and presence on and interactions with the business of the Debtor; (iii) the database containing the data described in (a) and (b) (including, but not limited to the Software that stores, and enables the visibility, use and manipulation of such data).

"Deposit" means the sum of Fifty Thousand and 00/100 ($50,000) Dollars which represents Ten (10%) Percent of the Agreement Purchase Price (as defined below).

"Excluded Assets" means all right, title, and interest in and to certain of the Debtor's assets related to the Business, including:  (i) Cash; (ii) bank account proceeds; (iii) accounts receivable, notes receivable, and other receivables (collectively, the "Receivables"), inclusive of all claims or causes of action for the recovery of the Receivables; and (iv) claims or causes of action against third parties, including, but not limited to all preference or avoidance claims or causes of action arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

"Final Order" means a Sale Order which is enforceable immediately upon entry and is not stayed by Bankruptcy Rules 6004(h), 6006(d), 7062, or 8005.

"Governmental Entity" means individually, and "Governmental Entities" means collectively, the United States of America, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court.

"Intellectual Property" means (a) patents and renewal applications, and including renewals, extensions and reissues (collectively, "Patents"), (b) registered and unregistered trademarks, service marks, brand names, domain names, logos, trade names, assumed names, fictitious names, d/b/a's , and all other indicia of origin or quality, together with the goodwill associated therewith, and all applications, registrations and renewals thereof (collectively, "Trademarks"), (c) published and unpublished works of authorship, whether copyrightable or not, including databases and any other compilations of information and applications and registrations thereof, and all derivative works, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"), (d) computer programs, software, user interface, URLs, web sites, source code, object code, websites, infomercials, marketing materials, databases and compilations, including any and all data and collections of data (including Website Data) whether machine readable or otherwise, algorithms, development tools, servers, and the like, flow charts, models and methodologies and other work product used to design, plan, organize and develop any of the foregoing, and user manuals and other training documentation related to any of the foregoing (collectively, "Software"), and (e) trade secrets, confidential information, show-how and knowhow, including processes, ideas, concepts, schematics, business methods and programs, formulae, drawings, prototypes, prototypes, models, designs, customer information, and lists, such as customer, manufacturer and supplier lists (collectively, "Trade Secrets"), and all Intellectual Property Rights arising from or in respect of each of the foregoing.

"Intellectual Property Rights" means all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights and moral rights; (b) trademark and trade name rights and similar rights; (c) trade secret rights; (d) patents and industrial property rights; (e) other proprietary rights in Intellectual Property; and (f) rights in or relating to registrations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the rights referred to in clauses "(a)" through "(e)" above.

"Inventory" means all inventory (including raw materials, products or work in-process, finished products, supplies and other inventories) of the Debtor, located in the Dicon Warehouse, the Easter Seals warehouse (as specified in Section 2(c)(ii) below), in New York, or otherwise, and in "as is where is" condition.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Lien" means any Claim, mortgage, pledge, hypothecation, restriction, security interest, encumbrance, option, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute other than to reflect ownership by a third party of property leased to the Debtor under a lease which is not in the nature of a conditional sale or title retention agreement, or any subordination arrangement in favor of another Person.

"Order" means any writ, decree, order, judgment, injunction, regulation, code, plan, charge, rule, ruling, voting right, or consent of or by a Governmental Entity.

"Party" and "Parties" have the meanings set forth in the preamble.

4

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Entity.

"Purchase Price" has the meaning set forth in Section 2(b).

"Sale Order" means an order of the Bankruptcy Court substantially in the form of **Exhibit "A"**, which provides for, among other things, the sale of the Acquired Assets under, among other section 363 of the Bankruptcy Code.

"Seller" has the meaning set forth in the seventh recital above.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction Documents" means this Agreement, the Bill of Sale, the Confidentiality Agreement, and any other agreement, instrument or certificate delivered in connection with the consummation of the transactions contemplated by this Agreement.

"Trustee" has the meaning set forth in the preamble above.

2.    Basic Transaction.

(a)    Purchase and Sale of Assets.  On and subject to the terms and conditions of this Agreement, at the Closing, Buyer agrees to purchase from Seller, and Seller agrees to sell, transfer, assign, convey, and deliver to Buyer, all of the Debtor's estate's right, title and interest in and to the Acquired Assets, free and clear of all Liens, Claims, interests, indebtedness and restrictions on transfer all as contemplated by sections 363(b), (f) and (m) of the Bankruptcy Code, for the consideration of the Purchase Price, except to the extent the Buyer agrees to take some or all of the Acquired Assets subject to any valid, existing Liens, Claims, interests, indebtedness or restrictions in accordance with subparagraph (c) in this **Section 2** and subparagraph (u) of Section 8 of this Agreement.

(b)    Purchase Price.  The purchase price (the "Purchase Price") shall be the aggregate of (i) Five Hundred Thousand ($500,000.00) Dollars cash (the "Agreement Purchase Price"); (ii) an amount equal to any increase to the Agreement Purchase Price resulting from the Buyer's bidding, if any, at the Auction (the "Bid Increase"), and (iii) the value of the Assumed Liabilities assumed under subparagraph (c) herein.  Buyer agrees to pay to Seller at the Closing the following:  $500,000.00, in Cash, of which $50,000 shall have already been delivered to Seller as the Deposit, plus any Bid Increase.  Nothing contained herein can or shall be deemed or construed as an admission or concession by either the Seller or the Buyer as to the allowable amount of any and all claims asserted or to be asserted against the Debtor and its estate by any

5

creditors and parties in interest unless a provision contained in this Agreement expressly concedes allowance of an amount.

(c) Additional Consideration. The Purchase Price shall also include as additional consideration the payment or assumption of Liability at Closing directly by the Purchaser to third parties for the following debts subject only to specific terms and conditions as described in Section 3 of this Agreement:

(i) for any and all amounts due and owing to transfer and/or take control of all Acquired IP, including registration fees, transfer fees, past due registration fees, and other similar fees.; and

(ii) the Buyer has the option, at its sole cost, to negotiate with Easter Seals for the release of certain of the Debtor's inventory (the "Easter Seals Inventory") under terms reasonably acceptable to the Seller, so that such negotiations shall be completed prior to the Auction and that the estate shall not be have any pecuniary responsibility to the Buyer and/or Easter Seals for the release of the Easter Seals Inventory (as such Easter Seals Inventory is not part of the Acquired Assets as defined herein and as listed on Exhibit "D" annexed hereto), and that such agreement shall be annexed hereto and incorporated herein as Exhibit "G".

(d) The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, commencing at 11:00 a.m. local time on a date to be determined in accordance with the terms and conditions of the Auction as approved by the Bankruptcy Court which shall include the following: (i) entry of the Sale Order; and (ii) the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself).

(e) Deliveries at the Closing. At the Closing: (i) Seller will deliver to Buyer the instrument of sale, transfer, conveyance, and assignment in the form attached hereto as Exhibit "B" (the "Bill of Sale"), (B) the Data; (C) all documents in the possession of the Trustee relating to the Acquired IP; and (C) such other instruments, certificates and agreements as Buyer and its counsel may reasonably request; and (ii) Buyer will execute, acknowledge (if appropriate), and deliver to Seller (X) such instruments, certificates and agreements as Seller and its counsel may reasonably request, (Y) the balance of the Purchase Price, including any Bid Increase, and (Z) authorize the release of the Deposit.

3.     Representations and Warranties of Seller.

As a material inducement to Buyer to enter into this Agreement, Seller hereby represents and warrants to Buyer that the statements contained in this Section 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement).

(a) Authorization of Transaction. Subject to the approval of the Bankruptcy Court as the case may be, Seller has the full power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform his obligations hereunder and thereunder. Without limiting the generality of the foregoing, Seller has duly authorized the

execution, delivery and performance of this Agreement and the other Transaction Documents. Subject to the approval of the Bankruptcy Court, this Agreement and the other Transaction Documents constitute valid and legally binding obligations of Seller, enforceable in accordance with their terms and conditions.

(b)     Upon consummation of the transactions contemplated herein, Buyer will have good and marketable title to the Acquired Assets owned by it, free and clear of all Liens, Claims, interests, indebtedness and restrictions on transfer except to the extent any Liens, Claims, interests, indebtedness or restrictions on transfer are assumed by the Buyer as part of the transactions contemplated herein.

(c)     Survival. All representations and warrantees made in this Section 3 shall survive the Closing.

(d)     Brokers' Fees. No broker, finder or other Person acting under Seller's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which any Buyer could be responsible, except that the Seller has engaged the services of David R. Maltz & Co., Inc. ("Maltz") by order of the Bankruptcy Court dated _____, 2011 (the "Maltz Retention Order"), with the Debtor's estate responsible for payment to Maltz upon the Closing and proper application by Maltz to the Bankruptcy Court consistent with the Maltz Retention Order.

4.     Representations and Warranties of Buyer.

Buyer represents and warrants to Seller that the statements contained in this Section 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 4).

(a)     Authorization of Transaction. Buyer has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and thereunder. This Agreement constitutes a valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions.

(b)     Brokers' Fees. No broker, finder or other Person acting under Buyer's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which any Seller could be responsible.

(c)     Certain Taxes. Buyer shall pay all sales, transfer, documentary stamp and other similar Taxes, if any, and all recording, filing and other governmental fees and costs assessable against Buyer solely due to its purchase of the Acquired Assets. Seller and Buyer will cooperate to prepare and file with the proper public officials, as and to the extent available and necessary, all appropriate sales tax exemption certificates or similar instruments as may be necessary to avoid the imposition of sales, transfer and similar Taxes in the transfer of the Acquired Assets pursuant hereto.

(d)     Inventory.   Buyer shall take possession of and remove all Inventory currently in the possession of Dicon.

(d)     Survival. All representations and warrantees made in this Section 4 shall survive the Closing.

7

5.    Conditions to Obligation to Close.

(a)    Conditions to Obligation of Buyer.   The obligation of Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i)    The Bankruptcy Court shall have entered (A) an Order approving the Competing Bid Requirements (the "Bid Procedures Order") substantially in the form of Exhibit "C" attached hereto or with such changes as are reasonably satisfactory to Buyer and (B) the Sale Order in the form of Exhibit "A" attached hereto or with such changes as are reasonably satisfactory to Buyer, and such Orders set forth above shall have become Final Orders;

(ii)    The United States Bankruptcy Court for the Southern District of Georgia (the "Dicon Court") shall have entered an order (the "Inventory Order") approving a stipulation of settlement between the Seller and the Trustee of Dicon Technologies, LLC ("Dicon")(the warehouseman of certain of the Debtor's inventory which is a part of the Acquired Assets (the "Dicon Inventory")), which will serve to release all Liens, Claims or other encumbrances on the Dicon Inventory held by Dicon, for the settlement sum of $15,000, solely for, and in contemplation of the transaction described herein;

(iii)    The Auction shall have been concluded and Buyer shall have been formally designated by the Bankruptcy Court as the successful bidder, or in the event that the successful bidder fails to close, Buyer is obligated to consummate the transactions contemplated herein by tendering the Purchase Price (less the Deposit);

(iv)    no Order of any Governmental Entity shall be in effect which prohibits the transactions contemplated by this Agreement;

(v)    There is no condition of title which renders title unmarketable; and

(vi)    All documents required under paragraph 2(e) have been executed and delivered.

To the extent permitted by applicable law, Buyer may waive any condition specified in this Section 5(a) if it executes a writing so stating at or prior to the Closing.

(b)    Conditions to Obligation of Seller.   The obligation of Seller to consummate the transactions to be performed by him in connection with the Closing is subject to satisfaction of the following conditions:

(i)    the Bankruptcy Court shall have entered the Sale Order;

(ii)    Buyer shall have performed and complied with all of its covenants hereunder in all material respects;

(iii)    no Order of any Governmental Entity shall be in effect which prohibits the transactions contemplated by this Agreement;

(iv)    the Dicon Court shall have entered the Inventory Order; and

     (v)   Buyer shall have paid the Purchase Price or any Bid Increase (less the Deposit);

Seller may waive any condition specified in this Section 5(b) if it executes a writing so stating at or prior to the Closing.

     6.    Seller's Excuse of Performance; Return of Buyer's Deposit.  In the event that (a) a third party bidding the minimum bid price or more is the successful bidder at the Auction, or (b) the Inventory Order is not entered by the Dicon Court, then, Seller shall be excused from performing any and all obligations to the Buyer under this Agreement, provided, however, that Seller shall return promptly the Buyer's Deposit to the Buyer, or its designated agent, within five (5) days of the conclusion of an Alternative Transaction.

     7.    Buyer Protections.  Competing Bid Requirements.  Subject to the approval of the Bankruptcy Court, the initial competing bid for the Acquired Assets must be at a minimum of $50,000 cash greater than the Purchase Price, and include either (i) the same exact assumptions of liability as provided for in Section 2(c) of this Agreement, or (ii) additional cash equal to the Assumed Liabilities, less that bidder's Deposit (an "Initial Competing Bid").  In the event that a third party qualifies to bid and places an Initial Competing Bid, the Buyer shall have the right, but not the obligation, to increase the cash component of its offer during the Auction in accordance with the bidding increments established for the Auction.  In the event that the buyer is not the successful bidder and a closing of the transactions contemplated by this Agreement is concluded, and in accordance with the Bid Procedures Order, the Buyer is entitled to a break-fee of $25,000 as compensation for monies spent and time invested into the transactions contemplated herein.

     8.   __Miscellaneous.__

     (a)   "AS IS" "WHERE IS" TRANSACTION.  EXCEPT AS PROVIDED FOR HEREIN, BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ACQUIRED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS.  BUYER FURTHER ACKNOWLEDGES THAT BUYER, PRIOR TO THE DATE THE AUCTION IS HELD, WILL HAVE CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PROPERTY CONSTITUTING THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS AND THE EXECUTION OF THIS AGREEMENT, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS

AND ACCORDINGLY, UPON CLOSING, BUYER WILL ACCEPT THE ACQUIRED ASSETS "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

      (b)     No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

      (c)     Entire Agreement.  This Agreement (including Confidentiality Agreement and other documents referred to herein) constitutes the entire agreement between the Parties, and supersedes any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

      (d)     Successors and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors, designees and/or permitted assigns.  No Party may assign either this Agreement or any of its rights, interests or Liabilities hereunder without the prior written approval of the other Party; provided, however, that Buyer may, after the Closing, assign any or all of its rights hereunder to any Person.  Notwithstanding the foregoing, Buyer may assign its interest and rights hereunder to a limited liability company or other entity affiliated with Buyer.

      (e)     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

      (f)     Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

      (g)     Notices; Business Days.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement or any other Transaction Document shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile followed by delivery by reputable overnight courier service (charges prepaid), or one (1) business day after being sent to the recipient by reputable overnight courier service (charges prepaid) or five (5) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid.  Such notices, demands and other communications shall be sent to the respective addresses indicated below:

If to Seller:

                Kenneth P. Silverman, Esq., Chapter 7 Trustee of
                Spongetech Delivery Systems, Inc.
                c/o SilvermanAcampora, LLP
                100 Jericho Quadrangle, Suite 300
                Jericho, New York  11753

                With a copy to:

                SilvermanAcampora, LLP
                100 Jericho Quadrangle, Suite 300
                Jericho, New York  11753
                Attn:  Brett S. Silverman, Esq.

If to Buyer:

> Andrew Tzanides
> 517 Wittich Terrace
> River Vale, New Jersey 07675
>
> Chao Jiang
> 25 River Dr S, Apt 2312
> Jersey City, NJ 07310
>
> with a copy to:
>
> Rabinowitz, Lubetkin & Tully, LLC
> 293 Eisenhower Parkway, Suite 100
> Livingston, NJ 07039
> Attn: Jay L. Lubetkin, Esq.

or to such other address, to the attention of such other Person and/or with such other copy or copies as the recipient party has specified by prior written notice to the sending party. If any time period for giving notice or taking action expires on a day which is a Saturday, Sunday or legal holiday in the State of New York (any other day being a "business day"), such time period shall automatically be extended to the next business day immediately following such Saturday, Sunday or legal holiday.

(h)     Governing Law.  Subject to the Bankruptcy Code, this Agreement and all other documents related hereto, including the Confidentiality Agreement, shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(i)     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties. No waiver by any Party of any default, misrepresentation or breach of warranty, covenant or agreement made or to be performed hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty, covenant or agreement made or to be performed hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(j)     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction if such invalidity or unenforceability does not destroy the basis of the bargain between the Parties.

(k)     Expenses.  Each of Buyer and Seller will bear their own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

(l)    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation (except in the case of defining Excluded Assets).  Nothing in any schedule attached hereto shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such schedule identifies the exception with particularity and describes the relevant facts in detail.

(m)    Incorporation of Confidentiality Agreement, Exhibits, Schedules and Annexes.  The Confidentiality Agreement and all exhibits, schedules and annexes identified in this Agreement are incorporated herein by reference and made a part hereof.

(n)    Submission to Jurisdiction.  With respect to matters not under the jurisdiction of the Bankruptcy Court, each of the Parties submits to the jurisdiction of any state or federal court sitting in or including within its jurisdiction the County of Nassau in the State of New York, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity.  The Bankruptcy Court shall retain jurisdiction over the Seller, the Buyer, and any party in interest with respect to this Agreement and the enforcement and implementation of the Sale Order with respect to any and all disputes arising under or related to this Agreement, and any and all rights conferred upon the parties under this Agreement.

(o)    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY SCHEDULE, EXHIBIT OR ANNEX HERETO, OR ANY COURSE OF CONDUCT, COURSE OF DEALING OR STATEMENTS (WHETHER VERBAL OR WRITTEN) RELATING TO THE FOREGOING. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

(p)    Termination of Covenants, Representations, and Warranties.  The covenants, representations and warranties made by Seller and/or Buyer shall terminate as of the Closing.

(q)    No Impediment to Liquidation.  Nothing herein shall be deemed or construed so as to limit, restrict or impose any impediment to the Trustee's right to liquidate, dissolve and wind-up the Debtor's affairs and to cease all business activities and operations at such time as he may determine following the Closing.

(r)    Access to Inventory Prior to Closing.  The Buyer shall have the right, but not the obligation, to seek access to any location on which Inventory is located up to and

including the date of the Closing (the "Access Period"), provided that the Buyer is not in default of any of the terms and conditions hereunder. The rights granted in this subsection shall be effective upon the Seller's receipt of the Deposit and shall continue during the Access Period unless or until the Bankruptcy Court issues a final order disapproving this Agreement. Notwithstanding the foregoing, the Buyer, its agents, assigns or successors are not permitted to and shall not operate the Business in any form or manner during the Access Period without the prior written consent of the Seller.

      (s)     Diligent Prosecution of Sale Motion. The Trustee shall use reasonable best efforts to file and prosecute a motion to approve this Agreement under a time frame that results in the Sale Order being entered by the Bankruptcy Court no later than May 15, 2011.

      (t)     Deadline to Obtain Sale Order. If the Bankruptcy Court Order is not obtained on or before May 15, 2011 for any reason, other than delay in obtaining the Inventory Order from the Dicon Court, unless such date is otherwise extended or waived in writing by the Buyer, then (i) this Agreement shall be deemed null and void and of no further force and effect, (ii) the Deposit shall be released to the Buyer with no further recourse against the Trustee or the Debtor, and (iii) neither party shall have any further rights or obligations hereunder. If the obtaining of the entry of the Inventory Order is delayed by the Dicon Court through no fault of the Seller, the deadline to Close contained herein shall be automatically extended for a period of time sufficient to obtain entry of the Inventory Order and the Bankruptcy Court Order.

      (u)     Notwithstanding any contrary provision in this Agreement, any and all Inventory sold or otherwise transferred under this Agreement shall remain subject to any and all Intellectual Property Rights of any third parties.

      9.     <u>Delivery of Data and Access to Debtor's Books and Records.</u>

      (a)     On or about the Closing, but in no event more than 10 business days after the Closing, the Seller shall turn over to the Buyer a duplicate copy of the Debtor's computer hard drive(s) containing any Data or other books and records in electronic format of the Debtor.

      (b)     Between the Closing Date and the closing of the Debtor's bankruptcy case, the Buyer and its authorized agents shall have reasonable access to the written books and records of the Debtor in the possession of the Trustee to the extent that: (i) such books, records and information relate to any period prior to the Closing Date; and (ii) such access may reasonably be required by the Buyer in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the Acquired Assets. Such access shall be afforded by the Trustee upon receipt of reasonable advance notice and during normal business hours. If the Trustee shall desire to abandon or dispose of any such books and records upon or prior to its dissolution, the Trustee shall: (A) give the Buyer at least fifteen (15) days prior written notice of such disposition; and (B) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the Buyer may select and/or to copy such books and records as the Buyer may select.

      (c)     Notwithstanding anything to the contrary set forth in this Section 9, no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client or other privilege; <u>provided</u> that the party asserting such privilege advises the other party of the specific assertion of such privilege.

10.     Post-Closing and Dicon Inventory.

(a)     Buyer's Obligation Post-Closing.     Subject to all of the terms and conditions contained herein regarding the Dicon Inventory, and after all conditions to Close have been satisfied, including the obtaining of the Inventory Order, and the Closing has been completely consummated, the Buyer shall have no more than 15 days from the date of Closing to take possession and remove all of the Dicon Inventory from the Dicon Warehouse (the "Removal Date"). In the event that the Buyer has not removed all of the Dicon Inventory from the Dicon Warehouse on or before the Removal Date, the Buyer shall be solely responsible for any and all costs associated with the storage of the Dicon Inventory from the 16th day after Closing through and including the date all of the Dicon Inventory has been removed from the Dicon Warehouse. Removal of the Dicon Inventory is not a condition to Closing, and such removal is the sole responsibility of the Buyer.

(b)     Seller's Liability. As described herein, the Seller shall have no liability or obligation to Dicon or the Buyer concerning the Dicon Inventory, except that, the Sellers sole obligation regarding the Dicon Inventory is limited to the remittance of $15,000 to Dicon to secure the release of the Dicon Inventory, free of any Liens, Claims, or encumbrances that Dicon might have in and to the Dicon Inventory, conditioned upon the occurrence of both (a) entry of the Inventory Order, and (b) that the Buyer or successful bidder shall completely consummate the Closing. Should the Buyer fail to take possession and remove the Dicon Inventory from the Dicon Warehouse prior to the Removal Date, the Seller shall have no liability for any additional costs or expenses associated with the continued warehousing of the Dicon Inventory.

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the date first above written.

BUYER:

ANDREW TZANIDES

X_____     3-3-11

CHAO JIANG

X_____

SELLER:

X_____
KENNETH P. SILVERMAN, ESQ.,
SOLELY IN HIS CAPACITY AS CHAPTER
7 TRUSTEE OF SPONGETECH
DELIVERY SYSTEMS, INC.

14

10. **Post-Closing and Dicon Inventory.**

    (a)    **Buyer's Obligation Post-Closing.** Subject to all of the terms and conditions contained herein regarding the Dicon Inventory, and after all conditions to Close have been satisfied, including the obtaining of the Inventory Order, and the Closing has been completely consummated, the Buyer shall have no more than 15 days from the date of Closing to take possession and remove all of the Dicon Inventory from the Dicon Warehouse (the "Removal Date"). In the event that the Buyer has not removed all of the Dicon Inventory from the Dicon Warehouse on or before the Removal Date, the Buyer shall be solely responsible for any and all costs associated with the storage of the Dicon Inventory from the 16th day after Closing through and including the date all of the Dicon Inventory has been removed from the Dicon Warehouse. Removal of the Dicon Inventory is not a condition to Closing, and such removal is the sole responsibility of the Buyer.

    (b)    **Seller's Liability.** As described herein, the Seller shall have no liability or obligation to Dicon or the Buyer concerning the Dicon Inventory, except that, the Sellers sole obligation regarding the Dicon Inventory is limited to the remittance of $15,000 to Dicon to secure the release of the Dicon Inventory, free of any Liens, Claims, or encumbrances that Dicon might have in and to the Dicon Inventory, conditioned upon the occurrence of both (a) entry of the Inventory Order, and (b) that the Buyer or successful bidder shall completely consummate the Closing. Should the Buyer fail to take possession and remove the Dicon Inventory from the Dicon Warehouse prior to the Removal Date, the Seller shall have no liability for any additional costs or expenses associated with the continued warehousing of the Dicon Inventory.

    IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the date first above written.

**BUYER:**

**ANDREW TZANIDES**

X _____

**CHAO JIANG**

X _____

**SELLER:**

X _____
**KENNETH P. SILVERMAN, ESQ.,
SOLELY IN HIS CAPACITY AS CHAPTER
7 TRUSTEE OF SPONGETECH
DELIVERY SYSTEMS, INC.**

14

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

In re:                                          Chapter 7

SPONGETECH DELIVERY SYSTEMS, INC.,              Case No. 10-13647 (SMB)

                    Debtor.
------------------------------------------------------------------x

### ORDER APPROVING THE CHAPTER 7 TRUSTEE'S SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES IN ACCORDANCE WITH 11 U.S.C. §363 <u>SUBJECT TO THE TERMS AND CONDITIONS OF THE ASSET PURCHASE AGREEMENT</u>

Upon the motion dated March 3, 2011 (the "Motion") of Kenneth P. Silverman, Esq. (the "Trustee"), the chapter 11 trustee of the estate of Spongetech Delivery Systems, Inc. (the "Debtor"), by his undersigned attorneys, SilvermanAcampora LLP, seeking, among other relief, the entry of an order in accordance with sections 105 and 363 of title 11, United States Code (the "Bankruptcy Code"), among other things, authorizing the Trustee's sale (the "Sale") of substantially all of the Debtor's assets, including, but not limited to, the Debtor's Intellectual Property (as defined in section 1 of the Asset Purchase Agreement, which has been annexed hereto as **Exhibit "A"**) and certain inventory (collectively, the "Assets"), to Andrew Tzanides, or his designee or assign (the "Stalking Horse Offeror"), subject to higher or better offers as may be tendered at a public auction sale, held on **April 11, 2011, at 1:00 p.m.** (the "Auction"), free and clear of all liens, claims, encumbrances, security interests and other restrictions on transfer, subject to the terms of the Asset Purchase Agreement (collectively, the "Liens"), with such Liens, if any, to attach to the proceeds of the Sale in the same amount, priority and validity as they currently exist (the "Sale Order"); and authorizing the Trustee to consummate the Sale contemplated under the Asset Purchase Agreement; and upon the hearing held on March 15, 2011 to consider proposed sale procedures in connection with the Sale and Auction; and upon the Order entered on March __, 2011 (the "Sale Procedures Order"), authorizing the Trustee to conduct the Auction of the Assets, including providing a break-up fee and certain bid protections to the Stalking Horse Offeror, subject to higher or better offers to be obtained at the Auction; and a hearing having been held on April 14, 2011 on that portion of the Motion seeking approval of the Sale of the Assets (the "Sale Hearing"), at which time all parties in interest

were afforded an opportunity to be heard; and upon the record of the Sale Hearing which is incorporated herein by reference; and after due deliberation and consideration of all the facts and circumstances herein, and upon the affidavit of service of the Motion and the Sale Procedures Order on file with the Court; and the relief sought in the Motion being determined to be in the best interest of the Debtor's estate and its creditors and no further notice being necessary or required; it is hereby **FOUND AND DETERMINED THAT:**

A.    For the reasons discussed on the record of the Sale Hearing, the Trustee has demonstrated good and sufficient business justifications for the Sale and has demonstrated compelling circumstances for the Sale under Bankruptcy Code § 363(b).

B.    The sale procedures contained in the Sale Procedures Order provided a full, fair and reasonable opportunity for any person or entity to make an offer to purchase the Assets. The Auction was duly noticed, and the Trustee conducted the Auction in accordance with the Sale Procedures Order, in a non-collusive, fair and good faith manner.

C.    The bid at the Auction of $_____ (the "Purchase Price") for the Assets by _____ (the "Successful Bidder") was the highest and best offer for the Assets at the conclusion of the Auction.

D.    As demonstrated by the testimony or other evidence proffered or adduced at the Sale Hearing, the Trustee adequately marketed the Assets; and the Purchase Price constitutes the highest and best offer for the Assets and provides reasonable consideration for the Assets.

E.    The Sale, the Asset Purchase Agreement and the transactions contemplated therein were negotiated, proposed and entered into by the Trustee and the Successful Bidder in good faith, without collusion and from arm's-length bargaining positions. The Successful Bidder is a "good faith purchaser" within the meaning of Bankruptcy Code § 363(m).   Neither the Trustee nor the Successful Bidder engaged in any conduct that would cause or permit the Sale, or the Asset Purchase Agreement, to be avoided or costs and damages to be imposed under Bankruptcy Code § 363(n).

F.    Notice of the Sale Procedures Order and the Sale Hearing was fair and appropriate

BSS/862085.2/059228

under the circumstances.

G.      The Trustee has satisfied the requirements for Sale of the Assets free and clear of the Liens under Bankruptcy Code § 363(f).

**NOW THEREFORE, IT IS HERBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted to the extent set forth herein and the Sale is approved as set forth in this Order.

2.      All objections to the Motion or the Sale that have not been withdrawn, waived, settled or adjourned are hereby overruled on the merits, except as provided herein.

3.      The Trustee is authorized and empowered to sell the Debtor's right, title and interest in the Assets to the Successful Bidder, free and clear of the Liens, except for Excluded Liens under the Asset Purchase Agreement, with such Liens to attach to the proceeds of such Sale in the priority and validity as they presently exist.

4.      The Trustee is authorized to consummate the Asset Purchase Agreement and the transactions under the Asset Purchase Agreement.

5.      In the absence of a stay pending appeal, if the person or entity identified as the Successful Bidder in Schedule "A" fully performs under the terms and conditions of the Asset Purchase Agreement, then, the Successful Bidder shall be entitled to the protection of Bankruptcy Code § 363(m) or any authorization contained herein with respect to the Trustee's Sale of the Assets and the purchase by the Successful Bidder of the Assets constitutes a purchase in good faith for fair value within the meaning of Bankruptcy Code § 363(m).

6.      The Stipulation is hereby approved and the Trustee is authorized and directed to pay $15,000, at, or immediately subsequent to, and in no event later than two (2) business days following, the closing of the sale of the Assets, to the Dicon bankruptcy estate in connection with the Inventory Order.

7.      In the event that the Stalking Horse Offeror is not the Successful Bidder, than the Trustee is authorized and directed, consistent with the Sale Procedures Order, to pay at closing of or within two (2) business days after closing of the Sale of the Assets, to the Stalking Horse Offeror

3

the negotiated and approved break-up fee or expense reimbursement of $25,000.

8. The Sale approved by this Order is not subject to avoidance, pursuant to Bankruptcy Code § 363(n).

9. Notwithstanding Rule 6004(h) the Federal Rules of Bankruptcy Procedure, this Order shall be effective as of the date of its entry.

10. The service of the Notice of Sale pursuant of the Sale Procedures Order as reflected on the Affidavits of Service field with the Court is deemed good and sufficient service and no further notice of the relief provided for herein is necessary or required.

11. Each and every federal, state and local governmental agency, department and official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the Asset Purchase Agreement.

12. The Trustee is authorized to modify or amend the Asset Purchase Agreement in a writing signed by both parties to the Asset Purchase Agreement, without further order of the Court, provided that any such modification or amendment does not materially change the terms of the Asset Purchase Agreement.

13. The Trustee is authorized to do such things and execute such documents and expend such funds as may be necessary to effectuate the terms and conditions of this Order.

Dated: New York, New York
     April __, 2011

HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

4

# EXHIBIT B

## BILL OF SALE

This BILL OF SALE (this "Bill of Sale"), dated this ___th day of April, 2011, is from Kenneth P. Silverman, Esq., solely in his capacity as chapter 7 trustee (the "Trustee" or the "Seller") of the estate of Spongetech Delivery Systems, Inc. (the "Debtor"), a chapter 7 debtor in the United States Bankruptcy Court for the Southern District of New York, case number 10-13647 (SMB), to Andrew Tzanides and Chao Jiang, or their designee or nominee (the "Purchasers"), pursuant to the Order entered by the Honorable Stuart M. Bernstein on April ___, 2011 (the "Sale Order"), approving the sale of the Debtor's estate's interest in the assets (the "Sale"), in accordance with the Asset Purchase Agreement dated March 3, 2011 (the "Agreement"), entered into by and among the Seller and Purchaser.

NOW, THEREFORE, pursuant to the Agreement and the Sale Order, and for and in consideration of the sum TEN and 00/100 Dollars ($10.00) lawful money of the United States, and for other good and valuable consideration received from the Purchasers, the receipt and sufficiency of which are hereby conclusively acknowledged:

1.     The Seller hereby sells, transfers, conveys, assigns, and delivers all of Seller's right, title, and interest in and to the assets set forth on Schedule A to the Agreement in an "as is", "where is" condition with no representation or warranties of any kind or nature whatsoever, free and clear of any and all liens, claims, encumbrances and security interests of whatever kind or nature (the "Liens"), except as set forth in the Asset Purchase Agreement and Schedule A annexed thereto, with such Liens, if any, to attach to the proceeds of sale in the priority and validity as they presently exist.

2.     The terms and provisions of the Asset Purchase Agreement and the Sale Order approving the Sale, together with the terms and provisions of this Bill of Sale, shall be binding in all respects upon, and shall inure to the benefit of, the parties thereto, and their respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties, and all persons asserting a claim against or interest in the Debtor's estate or any of the assets to be sold, transferred, conveyed, assigned, and delivered pursuant to the Asset Purchase Agreement.

3.     All of the terms and provisions of this Bill of Sale will be binding upon the Seller and its successors and assigns and will inure to the benefit of Purchaser and its respective successors and assigns.

4.     This Bill of Sale shall be governed by the laws of the State of New York, without regard to conflicts of law principles thereunder.

5.     This Bill of Sale is being executed and delivered by the Seller pursuant to and in accordance with the Sale Order of the United States Bankruptcy Court for the Southern District of New York entered on April ___, 2011 in the Debtor's bankruptcy case, which became final and non-appealable on April ___, 2011.

6.     The Seller is acting solely by virtue of his appointment as a chapter 7 Trustee pursuant to the Notice of Appointment dated November 10, 2010, filed by the Office of the United States Trustee in the Debtor's case and this Bill of Sale shall be non-recourse to the Trustee in all respects.

**IN WITNESS WHEREOF,** this Bill of Sale to be executed as of the date and year first set forth above.

Kenneth P. Silverman, Esq.
Chapter 7 Trustee of the estate of Spongetech Delivery Systems, Inc.

By: _____
       Kenneth P. Silverman, solely in his
       capacity as Chapter 7 Trustee

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re:                                                        Chapter 7

SPONGETECH DELIVERY SYSTEMS, INC.,                            Case No. 10-13647 (SMB)

                                        Debtor.
-----------------------------------------------------------------x

### ORDER ESTABLISHING SALE PROCEDURES, INCLUDING PROCEDURES GOVERNING THE PROPOSED PUBLIC AUCTION AND NOTICE, APPROVAL OF A BREAK UP FEE FOR THE STALKING HORSE OFFEROR IN CONNECTION WITH CHAPTER 7 TRUSTEE'S PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, SUBJECT TO HIGHER OR BETTER OFFERS, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES

Upon the motion dated March 7, 2011 (the "Motion") of Kenneth P. Silverman, Esq., the chapter 7 trustee of the estate of Spongetech Delivery Systems, Inc. (the "Debtor"), by his undersigned attorneys, SilvermanAcampora LLP ("SilvermanAcampora"), seeking, among other relief, the entry of an order in accordance with sections 105 and 363 of title 11, United States Code (the "Bankruptcy Code"), and related Federal Rules of Bankruptcy Procedure: (i) authorizing and approving the terms and conditions of the asset purchase agreement (the "Asset Purchase Agreement") for the sale (the "Sale") of certain of the Debtor's assets listed on Exhibit "A" to the Asset Purchase Agreement (collectively the "Assets"), by the Trustee, to the stalking horse offeror, subject to higher or better offers for the Assets as may be tendered at a public auction sale (the "Auction"), to be held on April 11, 2011, at 1:00 p.m., free and clear of all liens, claims, encumbrances, security interests and other restrictions on transfer, except for certain permitted encumbrances, in accordance with, and subject to, the terms and conditions of the Asset Purchase Agreement (collectively, the "Liens"), with such Liens to attach to the proceeds of Sale, if any, in the amount and priority as they currently exist; (ii) authorizing the consummation of the transactions contemplated therein; (iii) approving certain sale procedures for the Auction (the "Auction Procedures"); (iv) approving a break-up fee for the Stalking Horse Offeror[1] (the "Break-Up Fee"); (v) fixing the date for a hearing on the Sale for April 14, 2011, at 10:00 a.m. (the "Sale Hearing"); (vi)

---

[1]  All capitalized terms used but not defined herein shall have the same meanings ascribed to such terms in the Motion.

approving the form, time and scope of notice of the Auction (the "Notice Procedures", and collectively with the Auction Procedures, the "Sale Procedures"); and (vii) granting related relief; and a hearing having been held on that part of the Motion seeking approval of the Sale Procedures before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, United States Bankruptcy Court, Southern District of New York, Alexander Hamilton U.S. Custom House, Courtroom 723, New York, New York 10004 on the 15th day of March, 2011 (the "Sale Procedures Hearing"), at which time all parties in interest were afforded an opportunity to be heard; and upon the record of the Sale Procedures Hearing which is incorporated herein by reference; and after due deliberation and consideration of all the facts and circumstances herein; and upon the affidavit of service of the Motion on file with the Court; and the relief sought being determined to be in the best interest of the Debtor's estate and its creditors, and no further notice being necessary or required, it is

ORDERED, that the Motion is granted to the extent provided for herein, and all other relief sought in the Motion not granted herein shall be considered at the Sale Hearing; and it is further

ORDERED, that the notice of the Sale Procedures Hearing and Auction as given by the Trustee on less than ten (10) days notice, shortened under Fed R. Bankr. P. 9006(c), as described in the Motion is deemed adequate under the circumstances; and it is further

ORDERED, the offering of the Break Up-Fee to the Stalking Horse Offeror requesting such fee in his Asset Purchase Agreement is hereby approved in the amount of $25,000, as set forth in the Motion, and the Trustee is authorized and directed to pay the Break-Up Fee to the Stalking Horse Offeror from the proceeds of the Sale of the Assets at or subsequent to a closing actually occurring on such Sale if, and only if, a party other than such Stalking Horse Offeror is deemed to be the Successful Bidder at the conclusion of the Auction for the Assets; and it is further

ORDERED, that the Initial Overbid of $550,000, as contained in the Asset Purchase Agreement, and subsequent bidding increments of $10,000, as contained in the Auction Procedures are approved; and it is further

BSS/861475.2/059228

**ORDERED,** that the Auction Procedures, annexed hereto as **Exhibit "A"**, are approved in all respects; and it is further

**ORDERED,** that the Auction will be held on April 11, 2011, at 1:00 p.m., at the offices of SilvermanAcampora, 100 Jericho Quadrangle, Suite 300, Jericho, New York, or such other place to be determined in the discretion of the Trustee, and the Trustee shall offer the Assets for inspection by appointment at reasonable times, requested by the interested party to SilvermanAcampora who will make such arrangements, so long as the request is made no less than forty-eight (48) hours prior to the requested inspection; and it is further

**ORDERED,** that a hearing will be held before the Court, on April 14, 2011, at 10:00 a.m. (the "Sale Hearing"), to consider the entry of an order (the "Sale Order")[2], authorizing the Sale to the Successful Bidder at the conclusion of the Auction; and it is further

**ORDERED,** that objections, if any, to the Sale, including but not limited to the Sale of the Assets shall be filed with the Bankruptcy Court by April 11, 2011 at 4:00 p.m., electronically in accordance with General Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing System may be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-399, and must be and served on: (i) SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753 (Attn: Brett S. Silverman, Esq.); (ii) the Office of the United States Trustee, 33 Whitehall Street, 22nd floor, New York, New York 10004 (Attn: Elisabetta G. Gasparini, Esq.); and (iii) Rabinowitz, Lubetkin & Tully, L.L.C., 293 Eisenhower Parkway, Suite 100, Livingston, New Jersey 07039 (Attn: Jay L. Lubetkin, Esq.); and it is further

**ORDERED,** the Notice Procedures are hereby approved, and the Trustee shall serve a copy

BSS/861475.2/059228

of this Order, with exhibits, as well as all exhibits to the Motion (collectively, the "Sale Notice"): (i) on or before March __, 2011, by first class mail, overnight delivery, facsimile, or e-mail on the Notice Parties in accordance with the Notice Procedures established in the Motion, and on any additional person or entity that the Trustee determines should receive the Sale Notice, with all affidavits of service to be filed prior to the Sale Hearing; and it is further:

ORDERED, that the Trustee is authorized to expend such funds necessary to effectuate the terms and conditions of this Order.

Dated: New York, New York
March __, 2011

_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[2] A form of Sale Order is annexed to the Motion as Exhibit B, but the Court is not ruling on the form of that order at this time, but will consider same at the Sale Hearing.

BSS/861475.2/059228

<u>EXHIBIT A</u>

<u>TERMS AND CONDITIONS OF SALE</u>

1.     These Terms and Conditions of Sale are being promulgated in connection with the proposed court authorized public auction sale (the "Auction") by Kenneth P. Silverman, Esq. (the "Trustee"), the chapter 7 trustee of the estate of Spongetech Delivery Systems, Inc. (the "Debtor") of the Debtor's right, title, and interest in and to the assets (collectively, the "Assets") listed on and incorporated herein by Exhibit "A" annexed hereto.

2.     By order dated March __, 2011, the public auction sale has been approved by the United States Bankruptcy Court for the Southern District of New York (the "Court"), where the Debtor's bankruptcy case is pending.

3.     The Trustee has entered into a stalking horse asset purchase agreement (the "Asset Purchase Agreement") with Andrew Tzanides and Chao Jiang, or their designee or assign, for the Assets (the "Stalking Horse Offeror"). Prior to the commencement of the Auction, copies of the Asset Purchase Agreements are available for review by Qualified Bidders by telephonic request to SilvermanAcamora LLP, attn: Brett S. Silverman, Esq., (516) 479-6300. The Assets are only being sold as a whole and will not be offered or sold as separate lots.

4.     The Assets are being sold pursuant to the terms and conditions of the Asset Purchase Agreement, therefore, all bids will be on the Asset Purchase Agreement and its annexed exhibits. **IN THE EVENT THESE TERMS AND CONDITIONS DIFFER FROM THE TERMS AND CONDITIONS OF THE ASSET PURCHASE AGREEMENT, THE TERMS AND CONDITIONS OF THE ASSET PURCHASE AGREEMENT SHALL CONTROL.** In the event the Asset Purchase Agreement is silent concerning the conduct of the Auction, these terms and conditions shall control.

5.     The initial opening bid for the Assets (the "Opening Bid") is $500,000, offered by the Stalking Horse Offeror as part of the Asset Purchase Agreement.

6.     The initial minimum overbid for the Assets shall be no less than $550,000 which is comprised of the aggregate of: (a) the Opening Bid, (b) the Break Up Fee ($25,000), and (c) an additional economic enhancement for the Debtor's estate ($25,000)(collectively, the "Initial Overbid"). Following the Initial Overbid, all subsequent overbids bids for the Assets must be in increments of $10,000.

7.     For purposes of the Auction and these Terms and Conditions, a "Qualified Bidder" is either (a) the Stalking Horse Offeror; or (b) an individual or entity (each, an "Interested Bidder") which (i) registers with SilvermanAcampora at least forty-eight (48) hours prior to the commencement of the Auction (the "Bid Deadline"); (ii) tenders a good faith earnest money deposit by *wire transfer or bank check* (made payable to the SilvermanAcampora LLP as attorneys for Kenneth P. Silverman, Esq., the chapter 7 trustee of Spongetech Delivery Systems, Inc.) equal to ten (10%) percent of the Initial Overbid for the Assets ($55,000)("Deposit"); (iii) provides evidence, satisfactory to the Trustee, that the bidder has the financial ability to satisfy its bid in cash or by wire transfer; and (iv) provides evidence, satisfactory to the Trustee, that the bidder has the ability to close the Sale no later than three (3) business days after the

entry of an order approving the Sale or after the entry of the Inventory Order (as defined in the Asset Purchase Agreement), which ever is later in time (the "Closing Date").

8. Furthermore, notwithstanding the foregoing, the Trustee in his sole discretion, to promote competitive bidding to maximize the value of the Assets, reserves the right, in his sole discretion, to accept offers for the Assets subsequent to the Bid Deadline and upon such terms as he deems acceptable

9. Only Qualified Bidders will be permitted to bid for the Assets.

10. The full amount of the Deposit required herein will be payable by *wire transfer or bank check*, to be deposited with Trustee's attorneys (SilvermanAcampora LLP), and will be nonrefundable in the event that the bid is approved by the Bankruptcy Court. The Deposit from the Successful Bidder will be applied as a credit against the purchase price paid by the Successful Bidder. At the conclusion of the Auction, all Deposits made by Interested Bidders other than the Successful Bidder will be returned promptly after the closing of the Sale. If the Stalking Horse Offeror is determined not to be a Successful Bidder, their Deposit shall be refunded promptly after the closing of the Sale, pursuant to the terms of the Asset Purchase Agreement.

11. Bids at the Auction must be all cash, without financing, or other contingencies unless such contingencies are provided for in the Asset Purchase Agreement.

12. The Assets will be sold to the Qualified Bidder submitting the highest or best bid, subject to the reasonable business judgment of the Trustee.

13. If the Successful Bidder fails to close the purchase in accordance with the terms herein, subject to the terms of the Asset Purchase Agreement, if any, it will forfeit its Deposit and the Assets will be sold to the bidder submitting the next highest or best bid (as approved by the Court at the Sale Hearing).

14. Unless otherwise provided for in the Asset Purchase Agreement, the Successful Bidder must pay the purchase price for the Assets to the Trustee by *wire transfer or bank check* at the closing of title to the Assets (the "Closing"), and the Successful Bidder must close title to the Assets in accordance these Terms and Conditions of Sale and the terms of the Assets Purchase Agreement on the Closing Date, at the office of the Attorneys for the Trustee, SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, although such Closing Date may be extended solely by the Trustee in his sole discretion. All applicable taxes, fees or other additional consideration shall be paid by the Successful Bidder in accordance with the Asset Purchase Agreement, and shall be paid at the Closing. **Time is of the Essence with respect to the Successful Bidder's obligation to pay the Balance of the Purchase Price on the Closing Date.** The Successful Bidder shall be obligated to Close title to the Assets and there is no contingency of any kind or nature that will permit the Successful Bidder to cancel these Terms and Conditions of Sale other than the Trustee's inability to deliver title to the Assets. Anything to the contrary contained in these Terms and

BSS/861475.2/059228

Conditions of Sale notwithstanding, the Trustee shall have the right in his sole and absolute option to adjourn the Closing Date in order to remedy any defect to title.

15. The Trustee shall convey the Assets by the delivery of a Bill of Sale.

16. Unless provided for in the Asset Purchase Agreement, the Assets are being sold in accordance with 11 U.S.C. § 363, **"AS IS"**, **"WHERE IS"** in their condition on the Closing Date, <u>without</u> any representations, covenants, guarantees or warranties by the Trustee <u>of any kind or nature whatsoever</u> (except to the extent provided for in the Asset Purchase Agreement), and free and clear of any liens, claims or encumbrances of whatever kind or nature subject to the terms and conditions of the Asset Purchase Agreement (collectively, the "Liens"), **except for Excluded Liens permitted under the Asset Purchase Agreement including intellectual property rights of third parties**, with such Liens, if any, to attach to the proceeds of the Sale of the Assets. By signing these Terms and Conditions of Sale, all bidders acknowledge that they have had the opportunity to review and inspect the Assets on which they are bidding and the form of the Bill of Sale that the Trustee will execute to convey the Assets and will rely solely thereon and on their own independent investigation and inspection of the Assets in making their bid. Neither the Trustee nor any of its representatives make any representations or warranties with respect to permissible uses of the Assets (except to the extent provided for in the Assets Purchase Agreement. All bidders acknowledge that they have conducted their own due diligence in connection with the Assets, and are not relying on any information provided by the Trustee or his professionals.

17. Neither the Trustee, his attorneys, his other professionals, or the Debtor's estate, are liable or responsible for the payment of fees of any broker that has not previously been approved by Order of the Court.

18. It is expressly understood that the Debtor shall <u>not</u> incur any cost or expense whatsoever in connection with the Sale of the Assets, except for the Trustee's own professional fees and expenses, unless otherwise provided for in the Asset Purchase Agreement, and the Successful Bidder herewith undertakes to pay any such expense of whatever kind or nature, even those costs and expenses which are payable by the Seller pursuant to any law or statute, including but not limited to, transfer, sales, or use taxes.

19. Nothing contained in these Terms and Conditions of Sale is intended to supersede or alter any provisions of the title 11, United States Code (the "Bankruptcy Code") or otherwise limit or interfere with the jurisdiction of the Court. All of the terms and conditions set forth in these Terms and Conditions of Sale are subject to modification as may be directed by the Trustee and subject to the terms and conditions of the Asset Purchase Agreement, or by the Court and subject to higher or better offers to be determined in the sole discretion of the Trustee. The Trustee reserves the right to modify, subject to the terms of the Asset Purchase Agreement, the terms and conditions of sale at the public sale or thereafter to maintain consistency with the provisions of the Bankruptcy Code and/or prior orders of the Court,

7

and maximize the value of the Assets for benefit of the Debtor's estate and its creditors.

20.    These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Auction for the Assets. By making a bid for the Assets, all Qualified Bidders will be deemed to have acknowledged having read these Terms and Conditions of Sale and having agreed to be bound by them.

21.    If the Trustee is unable to deliver title to the Assets in accordance with these Terms and Conditions of Sale or the terms and conditions of the Asset Purchase Agreement, for any reason whatsoever, the Successful Bidder will have no recourse against the Trustee, or any Broker or Auctioneer previously approved by Order of the Court, provided, however, that all Qualified Bidders shall be entitled to a return of their Deposits.

22.    The Trustee reserves its rights to withdraw the Assets from sale, subject only to the terms of the Asset Purchase Agreement, either prior, or subsequent to the Sale, for any reason whatsoever, as it, in his sole and absolute discretion, deems necessary or appropriate.

23.    The Sale of the Assets is subject to confirmation by the Trustee and the Court. The Trustee shall notify the Successful Bidder at the close of the Auction that its offer has been accepted as the highest or best offer for the Assets, and that the Trustee will seek approval of the Court for that offer.

24.    By participating in the Auction, all Qualified Bidders consent to the jurisdiction of the Court to determine such disputes under the Debtor's pending case. Any disputes concerning the Sale of the Assets shall be determined by the Court which shall retain sole and exclusive jurisdiction over all matters relating to the Assets and the Sale contemplated by these Terms and Conditions of Sale.

25.    Pursuant to Bankruptcy Rule 6004-1 no appraiser, auctioneer or officer, director, stockholder, agent, employee or insider of any appraiser of auctioneer, or relative of any of the foregoing, shall purchase, directly or indirectly, or have a financial interest in the purchase of, any property of the estate that the appraiser or auctioneer has been employed to appraise or sell.

26.    The Assets shall be delivered **"AS IS"**, **"WHERE IS"**, **"WITH ALL FAULTS"**.

I have read these Terms and Conditions of Sale and agree to be bound by them.

By: _____ Date: _____

Print Name: _____

BSS/861475.2/059228

# MEMORANDUM OF SALE

The undersigned has this __th day of April, 2011, agreed to purchase the Assets[3], vested in Kenneth P. Silverman, Esq., the Chapter 7 Trustee of the estate of Spongetech Delivery Systems, Inc., for the sum of $_____ DOLLARS and hereby promise and agree to comply with the Terms and Conditions of Sale of said Assets, as set forth in the annexed Terms and Conditions of Sale.


_____
PURCHASER (Signature)

_____
PURCHASER (Signature)

_____
PRINT NAME OF PURCHASER

_____
PRINT NAME OF PURCHASER


_____
ADDRESS

_____
ADDRESS

_____
TELEPHONE NUMBER

_____
TELEPHONE NUMBER

_____
FAX NUMBER

_____
FAX NUMBER


Received from _____ the sum of $_____.00 DOLLARS, as a non-refundable deposit for the purchase of the Assets pursuant to the Terms and Conditions of Sale.

Anthony C. Acampora, Esq.
Trustee's Counsel
**SILVERMANACAMPORA LLP**
A Member of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Tel (516) 479-6300
Fax (516) 479-6301

---

[3] Capitalized terms contained herein shall have the same meaning ascribed to them in the annexed Terms and Conditions of Sale.

BSS/861475.2/059228

# EXHIBIT D

# EXHIBIT E

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DICON TECHNOLOGIES, LLC,[1] | ) Case No. 10-41275 LWD |
| | ) |
| Dicon. | ) |
| | ) |

## STIPULATION

This stipulation of settlement (the "**Stipulation**") is entered into among Dicon Technologies, LLC ("**Dicon**"), by its duly appointed chapter 11 operating trustee, Lloyd T. Whitaker (the "**Dicon Trustee**"), solely in his capacity as chapter 11 operating trustee of Dicon Technologies, LLC, and Spongetech Delivery Systems, Inc. ("**Spongetech**"), by its duly appointed chapter 7 trustee, Kenneth P. Silverman, Esq., solely in his capacity as the chapter 7 trustee of Spongetech Delivery Systems, Inc. (the "**Spongetech Trustee**" together with Dicon Trustee, collectively, the "**Parties**" and each individually a "**Party**").

## R E C I T A L S

I.      On June 18, 2010, an involuntary petition was filed in the United States Bankruptcy Court for the Southern District of Georgia (the "**Dicon Court**") against Dicon, under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**") commencing case number 10-41275 (the "**Dicon Case**").

II.      By Notice of Appointment dated July 9, 2010, the Dicon Trustee was appointed as the chapter 11 trustee of Dicon in the Dicon Case.

---

[1]      The Dicon's address is Attn: Lloyd T. Whitaker, Chapter 11 Trustee of Dicon Technologies, LLC 2810 Spring Road, Suite 106, Atlanta, GA 30339. The last four digits of Dicon's taxpayer identification number are 7889.

III.    The Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "**Committee**") in this case on July 28, 2010 and amended the appointment of the Committee on July 29, 2010.

IV.    On July 9, 2010, Spongetech filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Spongetech Court**"), commencing case number 10-13647 (SMB)(the "**Spongetech Case**").

V.    By Order of the Court on August 4, 2010, Kenneth P. Silverman, Esq., was appointed as the chapter 11 operating Trustee of the Spongetech bankruptcy estate.

VI.    On November 10, 2010, the Spongetech Court entered an Order converting the Spongetech Case from a proceeding under chapter 11 to a liquidation proceeding under chapter 7 of the Bankruptcy Code.  Thereafter, the Court appointed the Spongetech Trustee as the chapter 7 Trustee in the Spongetech Case.  The Dicon Case remains in chapter 11 pending before the Dicon Court.

VII.    On January 31, 2011, the Parties executed a stipulation which among other things settled certain inter-bankruptcy estate claims and the Spongetech Trustee's complaint to substantively consolidate Dicon into the Spongetech bankruptcy estate (the "**Subcon Stipulation**").  Currently, both the Spongetech Trustee and the Dicon Trustee have filed motions pursuant to Rule 9019 of the Federal Rule of Bankruptcy Procedure (the "**Bankruptcy Rules**"), before their respective Courts, seeking orders approving the Subcon Stipulation.

VIII.    Since the commencement of the Spongetech Case, certain inventory (the "**Inventory**") has been held by or on behalf of Dicon.  The Dicon Trustee has asserted

2

certain claims, liens, encumbrances, or other rights in and to the Inventory (collectively, the "**Claims**").

IX.    The Spongetech Trustee has been negotiating with a prospective purchaser for the sale (the "**Spongetech Sale**") of substantially all of Spongetech's assets, which includes the Inventory.

X.    In order to consummate the Spongetech Sale, the Spongetech Trustee seeks a full release (the "**Release**") of the Claims on the Inventory by the Dicon Trustee, Dicon and any other entities that may or can assert any Claims in and to the Inventory. In exchange for the Release, the Spongetech Trustee will remit $15,000 (the "**Settlement Sum**") to the Dicon Trustee in full and final satisfaction of all the Claims in and to the Inventory in accordance with this Stipulation.

XI.    The Parties have engaged in extensive and arm's length negotiations concerning the Claims and have agreed to resolve the Claims and the Release of the Inventory as set forth in herein.

**NOW, THEREFORE**, as set forth herein, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree and stipulate as follows:

1.    The Parties acknowledge and agree that the foregoing recitals are true and correct to the best of their knowledge, information and belief and incorporate each of the recitals into this Stipulation as if fully restated herein.

2.    Promptly upon full execution of this Stipulation, the Dicon Trustee shall file a motion pursuant to Bankruptcy Rule 9019 before the Dicon Court, seeking an order of approving this Stipulation (the "**Approval Order**").

BSS/834112.3/059228

3.      As a condition to, and upon the consummation of the Spongetech Sale (the "**Closing**") between the successful bidder and the Spongetech Trustee, the Spongetech Trustee will promptly, within five (5) business days, remit the Settlement Sum to the Dicon Trustee by wire transfer. In addition to the Release, the Dicon bankruptcy estate also agrees to hold the Inventory (or have the Inventory held), free of any accrual of additional costs, fees or claims, for no more than 15 days after the Closing of the Spongetech Sale (the "**Removal Date**"). If after the Removal Date, the Inventory has not been claimed and removed from the possession of Dicon, the Order approving the Spongetech Sale shall provide that the successful bidder at the Spongetech Sale will be responsible for any charges or fees, to begin accruing after the Removal Date, associated with storing the Inventory, in accordance with the terms and conditions of the Spongetech Sale.

4.      If by May 15, 2011 (the "**Termination Date**"), the Spongetech Sale order is not entered, or the Closing has not taken place, other than delay in obtaining the Approval Order from the Dicon Court ("**Delay**"), and unless such Termination Date is otherwise extended or waived in writing by the Parties, this Stipulation and the Release contained herein, shall be null and void with neither Party having any further obligations hereunder. In the event of a Delay, and the Spongetech Sale has already been approved by the Spongetech Court, the Spongetech Trustee and the successful bidder of the Spongetech Sale shall have fifteen (15) days (the "**Closing Period**") from the date that notice has been delivered to the Spongetech Trustee of the entry of the Approval Order, to (a) Close the Spongetech Sale, and (b) remove the Inventory from Dicon's possession, notwithstanding if the Closing Period shall extend beyond the Termination Date.

4

5. The Dicon Trustee will request that the Dicon Court waive the applicability of Bankruptcy Rules 6004(h), 7062 and 9014 in the Approval Order, such that the Approval Order shall be effective on the first day after the Dicon Court has entered the Approval Order (the "**Effective Date**"), provided, however, that the Effective Date and this Stipulation in its entirety is conditioned upon (a) entry of the Approval Order by the Dicon Court, (b) the Spongetech Court entering an order approving the Spongetech Sale, and (c) the Closing of the Spongetech Sale is completed. In the event that (a) the Spongetech Sale fails to be approved by the Spongetech Court, or (b) the successful bidder fails to Close the Spongetech Sale (each, a "**Closing Failure**"), and regardless of whether the Dicon Court has entered the Approval Order, the Spongetech Trustee shall have no obligation to remit the Settlement Sum. In the event of a Closing Failure, the Spongetech Trustee waives any and all claims, rights, or other interests of any kind in and to the Inventory, and shall abandon the Inventory to the Dicon estate pursuant to Bankruptcy Code § 554(a).

6. The Dicon Trustee warrants and represents that any and all bills due and owing to Oneida Ltd (or its affiliate at which the Inventory is currently held) have or will be paid and that the Dicon Trustee will continue to satisfy any such obligation, through and including the Termination Date or the expiration of the Closing Period, which ever is later in time. Nothing contained herein can or shall be construed as an assumption of liability by the Spongetech Trustee, Spongetech estate or successful purchaser of the Spongetech Sale, except as provided in paragraphs 3, 4 and 5 above.

7. All notices required or permitted under or pertaining to this Stipulation shall be in writing and delivered by any method providing proof of delivery. Any notice

BSS/834112.3/059228

shall be deemed to have been given on the date of receipt. Notices shall be delivered to the undersigned signatories for the Parties at the addresses listed below, until a different address has been designated by notice to the other Party.

8.     The Dicon Court shall retain jurisdiction over this Stipulation and all matters that are brought before it related to the presentation of this Stipulation. In the event of any dispute concerning this Stipulation, the Parties agree to work in good faith to coordinate the resolution of any such dispute.

9.     Each Party has had the opportunity to review this Stipulation with legal counsel and agrees to the particular language of each of the provisions hereof. Interpretation of the terms of this Stipulation shall not be subject to any rule providing for interpretation against the Party who causes the uncertainty or against the Party who drafted the language in question, and all Parties shall be deemed to have participated equally in the drafting of this Stipulation.

10.    Nothing contained in this Stipulation is intended by the Parties hereto, nor shall anything contained herein be construed, to be an admission as to any liability or allegation of any other matter claim or defense of any Party.

11.    This Stipulation shall be binding upon and inure to the benefit of the Spongetech Trustee, the Dicon Trustee, the Dicon bankruptcy estate, and any other person or entity that may hold claims in and to the Inventory, the Spongetech bankruptcy estate (and any of its affiliates that are or may become debtors under the Bankruptcy Code, other than Dicon), and each of their successors and assigns.

12.    This Stipulation embodies the entire agreement of the Parties concerning the subject matter of the Stipulation, and supersedes any prior agreements,

6

understandings, promises or representations between the Parties concerning such the Inventory, but does not in any way affect the rights and provisions contained in the Subcon Stipulation.

13.    This Stipulation may not be altered, modified or changed, unless such alteration, modification or change is made in writing signed by all the Parties and subject to an appropriate order of the Dicon Court, if necessary.

14.    This Stipulation may be signed in facsimile counterparts, which when taken together, shall comprise and constitute one original document.

15.    No breach of any provision hereof can be waived, unless done in writing. Waiver of any one breach shall not be deemed a waiver of any other breach of the same or any other provision(s) hereof.

16.    This Stipulation shall be governed by the laws of the State of Georgia.

17.    The Parties hereto shall execute, acknowledge and deliver to the other, such other and further documents and instruments, or take such other and further action, as may be reasonably necessary to evidence or implement the terms of this Stipulation. As part of this obligation, all Parties to the Claims expected to be terminated as a result hereof agree not to actively prosecute their respective Claims while the Approval Motion is pending, through and including any time prior to the Effective Date or the denial of the Approval Motion by the Dicon Court.

BSS/834112.3/059228

Dated: Jericho, New York
      March __, 2011

**SILVERMANACAMPORA LLP**
Attorneys for Kenneth P. Silverman, Esq.,
Chapter 7 Trustee of SpongeTech Delivery
Systems, Inc.


By: _____
      Anthony C. Acampora
      Brett S. Silverman
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753


Dated: Atlanta, Georgia
      March __, 2011

**ALSTON & BIRD LLP**
Attorneys for Lloyd T. Whitaker
Chapter 11 Trustee of Dicon Technologies,
LLC


By: _____
      William S. Sugden
      Katie Z. Merrell
1201 W. Peachtree Street
Atlanta, GA 30309

BSS/834112.3/059228

# EXHIBIT F

# CONFIDENTIALITY AGREEMENT

In connection with a possible transaction between Kenneth P. Silverman, Esq., the chapter 7 trustee of Spongetech Delivery Systems, Inc. ("Spongetech")[1] and Andrew Tzanides ("Tzanides") (each a "Party") and collectively the "Parties") which may involve the acquisition, directly or indirectly, by Tzanides or his assignee, of some or all of the assets of Spongetech (the "Transaction"), each of Spongetech and Tzanides have agreed to furnish, or cause to be furnished to the other, certain information of the disclosing party which is non-public, confidential, personal or proprietary in nature ("Information"), subject to the following (the "Agreement"):

1.  The Information will be kept confidential and will not, without the prior written consent of the originator of the Information ("Originator"), be disclosed by the recipient of the Information ("Recipient") in any manner whatsoever, in whole or in part, and will not be used by the Recipient, directly or indirectly, for any purpose other than evaluating the Transaction. The Recipient will not use the Information so as to obtain any commercial advantage over the Originator or in any way which is, directly or indirectly, detrimental to the Originator.

2.  The term "Information" includes (a) any information of whatever nature relating to the Originator and its affiliates or any customer of or supplier or lender to the Originator and its affiliates regardless of whether the Information was communicated orally, in writing or by electronic transmission; and (b) any analysis, compilation, study or other record that contains or otherwise reflects or has been generated, wholly or partly, or derived from such Information ("Derivative Information").

3.  Each of the Parties will only reproduce or make such copies of any Information as are reasonably necessary for the purposes of evaluating the Transaction.

4.  Each of the Parties may reveal or permit access to the Information only to those agents, representatives (including lawyers, accountants and financial advisors), directors, officers and employees (each a "Representative") who need to know the Information for the purposes of evaluating the Transaction, who are informed of the confidential nature of the Information, who are directed to hold the Information in the strictest confidence and who agree to act in accordance with the terms and conditions of this Agreement. A preliminary list of such Representatives will be annexed hereto as **Schedule "A"**, and should either Party need to add further Representatives to the list it will need to do so in writing in advance of such Representative obtaining access or disclosure to the Information. Each of the Parties will take all necessary precautions or measures as may be reasonable in the circumstances to prevent improper access to the Information or use or disclosure of the Information by its Representatives and will be responsible for any breach of this Agreement by any of its Representatives.

5.  Without the prior written consent of the other Party, neither Party will disclose or permit its Representatives to disclose to any person the fact that the Information has been made available, that discussions or negotiations are taking place or have taken

---

[1] Spongetech Delivery Systems, Inc. filed a petition for relief under chapter 11 of title 11, United States Code in the United States Bankruptcy Court for the Southern District of New York on July 9, 2010, commencing bankruptcy case no. 10-13647.

place concerning a possible Transaction or any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof.

6. Spongetech agrees that Tzanides will retain proprietary rights in the Information disclosed to Spongetech and the disclosure of such Information shall not be deemed to confer on it any rights whatsoever in respect of any part thereof. Tzanides agrees that Spongetech will retain proprietary rights in the Information disclosed to Tzanides and the disclosure of such Information shall not be deemed to confer on it any rights whatsoever in respect of any part thereof.

7. If either Party determines that it does not wish to be involved in the Transaction, it will promptly advise the other of that fact. All copies of the Information will be returned to the Originator promptly upon the written request of the Originator, except for that portion of the Information which consists of Derivative Information which will be destroyed or erased from individual personal computers or other electronic devices (but which may be retained in back up servers if not intentionally made available to any person, and deleted in accordance with the Recipient's normal policies with respect to the retention of electronic records), and the Recipient will so certify provided, however, that one copy of each document or other matter constituting the Information may be retained by the Recipient's Legal Department, in secure storage, permanently subject to the terms of this Agreement, for use only in disputes relating to this Agreement.

8. The term "Information" shall not include such portions of the Information which: (i) are, or prior to the time of disclosure or utilization become, generally available to the public other than as a result of a disclosure by the Recipient or its Representatives; or (ii) are received from an independent third party who had obtained the Information lawfully and was under no obligation of secrecy or duty of confidentiality (specifically excluding any former officers, directors, employees, and/or consultants of Spongetech); or (iii) the Recipient can show were in its lawful possession before it received such Information from the Originator; or (iv) the Recipient can show were independently developed by it or on its behalf by personnel having no access to the Information at the time of its independent development; or (v) the Recipient is legally compelled or required to disclose, provided the notice provisions of paragraph 10 below are satisfied.

9. Each of Spongetech and Tzanides acknowledges that neither the Originator nor any of its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of the Information, and agrees that neither the Originator nor its Representatives shall have any liability, direct or indirect, to the Recipient or its Representatives relating to or resulting from the Information or the use thereof, errors therein or omissions therefrom, except in accordance with any specific representations and warranties made in any definitive Agreement entered into regarding the Transaction.

10. In the event that a Recipient or any of its Representatives becomes legally compelled or is required by regulatory authorities having appropriate jurisdiction (including a request of a securities commission or stock exchange) to disclose any of the Information, the Recipient will, provided it is not prohibited from doing so, promptly provide the Originator with written notice so that it may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of

059228/838281.1/BSS

this Agreement. The Recipient will cooperate with the Originator on a reasonable basis, in the Originator's efforts to obtain a protective order or other remedy. In the event that such protective order or other remedy is not obtained or the Originator waives compliance with the provisions of this Agreement, the Recipient will furnish only that portion of the Information which is required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information so furnished.

11. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Each Party hereby irrevocably (a) submits to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York (the "Court") in respect of any actions or proceedings ("Proceedings") relating in any way to this Agreement and the transactions contemplated hereby (and each party agrees not to commence any Proceeding relating thereto except in the Court); and (b) waives any objection to the venue of any Proceeding relating to this Agreement or the Transaction contemplated hereby in the Court, including the objection that any such Proceeding has been brought in an inconvenient forum.

12. No failure or delay by either Party in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise preclude any other or further exercise of any right, power or privilege under this Agreement.

13. Any Notice, consent or approval required or permitted to be given in connection with this Agreement ("Notice") shall be in writing and shall be sufficiently given, if delivered (whether in person, by courier service or other personal method of delivery), or if transmitted by facsimile or e-mail:

(a) to Spongetech at:

| | |
|---|---|
| Address: | Kenneth P. Silverman, Esq., Chapter 7 Trustee |
| | 100 Jericho Quadrangle, Suite 300 |
| | Jericho, New York 11791 |
| Attention: | Anthony C. Acampora, Esq. |
| Phone No.: | (516) 479-6300 |
| E-mail: | AAcampora@SilvermanAcampora.com |

(b) to Andrew Tzanides at:

| | |
|---|---|
| Address: | Solomon Consulting Corp., LLC |
| | 40 Wall Street, 28th Floor |
| | New York, New York 10005 |
| Phone No.: | (212) 380-7169 |
| E-mail: | Solomoncorpconsulting@gmail.com |

With a copy to Jay L. Lubetkin, Esq.:

| | |
|---|---|
| Address: | Rabinowitz, Lubetkin & Tully, LLC |
| | 293 Eisenhower Parkway, Suite 100 |
| | Livingston, NJ 07039 |
| Phone No.: | (973) 597-9100 |

059228/838281.1/BSS

E-mail: jlubetkin@rltlawfirm.com

Any Notice, delivered or transmitted to a party as provided above, shall be deemed to have been given and received on the day it is delivered or transmitted, provided that it is delivered or transmitted on a business day prior to 5:00 p.m. EST in the place of delivery or receipt. However, if the Notice is delivered or transmitted after 5:00 p.m. EST or if such day is not a business day, then the Notice shall be deemed to have been given and received on the next business day. Any party may, from time to time, change its address by giving Notice to the other parties in accordance with the provisions of this section.

14. Each of Spongetech and Tzanides acknowledges that disclosure of the Information or other breach of this Agreement would cause serious and irreparable damage and harm to the Originator of such Information and that remedies at law would be inadequate to protect against breach of this Agreement, and each agrees in advance to the granting of injunctive relief in favour of the Originator for any breach of the provisions of this Agreement and to the specific enforcement of the terms of this Agreement, without proof of actual damages, in addition to any other remedy to which the Originator would be entitled.

15. No amendment, supplement, modification, waiver or termination of this Agreement and, unless otherwise specified, no consent or approval by either of Spongetech or Tzanides, shall be binding unless executed in writing by the Party to be bound thereby.

16. The confidentiality and non-use obligations described in this Agreement shall terminate on the earlier of (a) the date of completion of the proposed Transaction; and (b) two (2) years from the date upon which all copies of the Information are returned or destroyed in accordance with this Agreement.

*[Signature page to follow]*

059228/838281.1/BSS

The undersigned hereby agrees to the foregoing as of the date set forth below.

**ANDREW TZANIDES**

_____

Name: Andrew Tzanides

Date: January ___, 2011


**KENNETH P. SILVERMAN, ESQ.,**
**CHAPTER 7 TRUSTEE OF THE ESTATE OF**
**SPONGETECH DELIVERY SYSTEMS, INC.**


By: _____

Name: Anthony C. Acampora

Date: January ___, 2011

059228/838281.1/BSS