

SpongeTech Delivery Systems
Jay Booth
to:
bernstein.chambers
06/08/2011 05:19 AM
Show Details

Dear Judge Bernstein;

My previous correspondence to you was incorporated into the motion written by Carol Arnold and Roy Hubbard, submitted on behalf of Mr. Hubbard, and which was heard on April 7, 2011.

This communication is necessitated by Trustee Silverman's Opposition to that Motion, as such arguments he made were directed toward me. I wish this was not necessary. However, with potentially additional Motions that may be submitted to your court, which may rely in part on any research I have done, I thought it prudent to be proactive in advising the court of the following responses to Mr. Silverman's comments.

From the Opposition (Opposition):

"21. In the more than eight (8) months since that conference, not a single shareholder, broker or clearing house has reported any short position or counterfeit share issue. Indeed, neither Hubbard, Jay Booth ("Booth") nor Venkatesh have alleged that they personally are the victims of a naked short transaction or are holding counterfeit shares."

Response: Shareholders who have contacted their brokerages have been advised by the various brokerages that they cannot provide certificates (certs), because the brokerages are unable to verify the authenticity of our shares.

To be so advised by our brokerages that certs cannot be obtained because they cannot be authenticated, demands an explanation as to how this happened. It is reasonable to conclude that this may very well be due, at least in part, to the presence of counterfeit shares in our market.

In addition, shareholders cannot prove that we are personally the victims of a naked short transaction, until we can verify the legal ownership of the shares that are in circulation. However, Mr. Silverman has refused to provide any transparency in this regard, despite a willingness by shareholders to pay the trustee to obtain share structure information for our continued study.


Opposition:

"22. Booth's "analysis" of public documents does not alter those facts. Booth, who apparently has no training or expertise in the securities industry, or in any type of securities analysis germane to the naked short sale issue, renders an "opinion" based upon his "analysis" of documents that are not annexed to the motion. Indeed, Booth's "opinion" is reflective of the balance of Hubbard's motion."

Response: The fundamental question in regards to my analysis should be focused on whether or not the analysis is accurate. Again, my totals matched what the Transfer Agents and the SEC reported.

However, over the last 11 years, I have had what may be considered relevant investigative and financial experience. This includes a period of employment as a Special Investigator for the United States government, conducting background investigations, which were used by the military and various civilian federal agencies. These investigations would often entail a review of the Subject's financial history. I mention this only because, as financial problems were discovered, it was my responsibility to quantify the problem, determine how the problems developed, and to report on the resolution of those issues, to the satisfaction of the sponsoring

governmental agency.

In addition, during this time, I was also registered with the National Futures Association as an informational Commodity Trading Advisor. This was at the request of my brokerage, as I was given the opportunity to moderate the brokerage's internet-based trading room, using a trading system that I developed and copyrighted. I subsequently went on to establish my
own trading room.

Again, the important issue is the accuracy of my analysis. While my recent history does not pertain, specifically, to naked shorting, it nonetheless is reflective of some experience in the securities industry, as well as a familiarity with reporting on financial issues to various governmental agencies.

Finally, Silverman notes that my data was not annexed to the Motion. However, the trustee fails to note that I did send to his office, at Mr. Moskowitz's request, some of the data that I had compiled. The following email excerpts reflect this.

*************************************************************************************

From: Jay Booth <jayatthelake2003@yahoo.com>
Date: Tue, 14 Dec 2010 02:00:34
To: <symoskowitz@msn.com>
Subject: I Have WorldWide's Transaction Data

Hi, Steve

Just wanted to let you know that I finished programming the share issuances and cancellations by WorldWide into my database. The reasons I am taking the time to let you know that are... So that you will know that the information the SEC provided in their complaint made it possible for me to create a TA Transaction Journal. Seems to me that they negated the effect of a gag on the TA...

*************************************************************************************

From: "steven moskowitz" <symoskowitz@msn.com>
Add sender to Contacts
To: "Jay Booth " <jayatthelake2003@yahoo.com>

Show to silverman

Sent from my Verizon Wireless BlackBerry

*************************************************************************************

From: "Jay Booth" <jayatthelake2003@yahoo.com>
View contact details
To: CQuigley@SilvermanAcampora.com
Message contains attachments
1 File (129KB)

    WorldWide Transaction Journal thru Dec 09.xlsxWorldWide Transaction Journal thru Dec 09.xlsx

Dear Ms. Quigley;

I am attaching a copy of a TA transaction journal that I created. This journal should reflect share issuances and cancellations for SpongeTech Delivery Systems, as reflected on the WorldWide Stock Transfer Company's

Transaction Journal.

The TA is gagged. However, I was able to put together this Transaction Journal from share data supplied by the SEC in their Complaint.

Please pass this on to Mr. Silverman, and advise him that the effect of a gag on the Transfer Agent was negated by the SEC for the period from June till December 2009.

Thank you.

Jay Booth

*********************************************************************************

In Silverman's opposition, he intimates that there is a possibility that I have not, in fact, compiled a database that traced the issuance of every cert the company has issued (as I understand the reason for his statement). He should know better, just based on the material I sent to his office.

Silverman never replied to my email. If he had taken any interest in evaluating the data, I would have been happy to send him additional information.

As I informed the court in my letter of January 28, 2011, it was my "...hope that fellow shareholders will be successful in retaining counsel to present a formal Motion, and I will assist that effort with the full body of my work, and a more comprehensive presentation of the issues." I did not commit to submitting a motion, personally. Therefore, Silverman cannot fault me for failing to attach the data to the Hubbard Motion. That same data was sent to James Sasser, as he has also submitted a motion to the court. And again, what Mr. Sasser chooses to do with the data is beyond my control.

Mr. Silverman stated that I have had no "...training or expertise in the securities industry, or in any type of securities analysis germane to the naked short sale issue." He goes on to say the following.

Opposition:

"23. Booth's "opinion" is not based upon any verifiable facts presented to the Court by an individual with any particular or identifiable expertise.6 Rather, Booth's opinion is devoid of factual support and, like Hubbard's motion, is based upon (a) unsubstantiated opinion, (b) speculation drawn from public documents, the accuracy of which are highly suspect, (c) a restatement of the rumor and innuendo circulating on the internet, and (d) a restatement of conversations with Moskowitz."

Footnote 6, referenced, is as follows: "6 References to statements made at the status conference, conversations with Moskowitz and a review of unidentified questionable public documents does not yield a conclusion that there were, in fact, 50 billion naked short sales or even a "very high probability" thereof."

Response: Your Honor, I have previously provided the court with both a synopsis of the issues (Doc 213, and Exhibit A of the Hubbard Motion), as well as supporting detail (Doc 237, and the amended Exhibit B to the Hubbard Motion). The focus of both communications was to present "verifiable facts" to the Court. Silverman failed to address or refute a single statement made in either document. His opinion that my analysis was "...not based upon any verifiable facts presented to the Court..." is totally without merit.

The "public documents" I used were largely the Davis Declaration and the SEC's Complaint. If these are the documents that Silverman is referencing, when he says the accuracy of the documents are highly suspect, then I would agree with him.

The trustee also states that my analysis was based upon "a restatement of conversations with Moskowitz."

Footnote 6 elaborates a bit on what the trustee meant, in regards to 50b naked short sales. Despite the previous correspondence with Moskowitz I have shared in this letter, and the fact that I am about to share another such communication, I have actually had very limited correspondence with Mr. Moskowitz. The following email, in addition to those previously disclosed, likely represent almost all of the communications I have had with Moskowitz for a very considerable time. My correspondence with Moskowitz in regards to 50b naked shorts is as follows (edited).

**************************************************************************

From: Jay Booth <jayatthelake2003@yahoo.com

<http://us.mc1805.mail.yahoo.com/mc/compose?to=jayatthelake2003@yahoo.com> >
Date: Wed, 24 Nov 2010 02:39:17
To: <symoskowitz@msn.com

The last page of Olde Monmouth's Transaction Journal apparently was the basis for Silverman's comment about a 50b naked short. (However, we have) proved that the cancelled shares total was doctored.

**************************************************************************

From: "steven moskowitz" <symoskowitz@msn.com>
Add sender to Contacts
To: "Jay Booth " <jayatthelake2003@yahoo.com>

Why you say its false or doctored

Sent from my Verizon Wireless BlackBerry

**************************************************************************

I replied that the total reported canceled shares was missing a digit. However, I subsequently found additional documentation from Olde Monmouth that likewise was missing a digit. This confirmed that the data was NOT doctored, but was, rather, the result of a printing error from the TA's database.

The point being that as the need arose to challenge statements from Moskowitz, those challenges were made. My analysis was not based upon input from Moskowitz, as the trustee suggests in Footnote 6.

However, "(r)eferences to statements made at the status conference" are germane, as they relate to the trustee's comments about having "no idea" on how to deal with the issue of naked shorting. If the trustee can question my analysis, based upon a perceived lack of expertise to qualify my conclusions, then how can the trustee proceed in this matter with his own admitted lack of understanding the issues? How can he negotiate a settlement with the SEC? How can he possibly conclude, as he stated in his Notice to Shareholders regarding an "NSS Claims Sale," that "(t)he Trustee has repeatedly stated, and it is an absolute fact, that the Debtor cannot defend, and has no defenses to the claims asserted against the Debtor, by the Securities and Exchange Commission?"

More to the point, and again based upon his testimony in the status conference about being "overwhelmed" by the issue of naked shorting, how does the trustee meet the Iriduim Criteria in terms of item 5, which states that "v. the competency and experience of the counsel who support the proposed settlement" is a factor to be considered in approving a settlement?

In addition, there are several conclusions drawn by the lawyers from the SEC that were challenged in the Exhibits I prepared for Mr. Hubbard's motion. In the event that there is any merit to the questions I raised, this would also reflect on the competency of the Commission's lawyers, at least as it regards this case.

Throughout the various documents the trustee has submitted, he has, as required, referenced applicable case decisions. However, how many of those cases dealt with a total lack of transparency in terms of share structure? How often has a trustee refused to provide share-related data?

The trustee's Objection to Hubbard's motion also notes the following. "Indeed, in an August 5, 2010 letter annexed as Exhibit B to Hubbard's motion, Booth previously asked the Court to order the Securities and Exchange Commission to conduct the identical forensic audit that the movants now demand of the Trustee." He is quite correct (about the letter, if not the Exhibit designation). Yet, here we are, nine months later, and absolutely nothing has been done to provide share-related information.

Why?

Why this notion of creating an NSS Claims Sale, separate from the sell of the shell? Is the purpose to relegate the pursuit of NSS claims to the Civil Courts? How could that litigation proceed, anyway, without the shell? Is the purpose also to prevent the sell of the shell?

Is this representative of arms-length bargaining?

Why agree to a revocation of the shares, without ever bothering to determine the ownership of the shares in existence?

Isn't that the least of what could be done? Isn't that normally expected in a bankruptcy proceeding, anyway? Doesn't a request from shareholders for that information rightly fall into the range of reasonableness?

As Silverman's settlement agreement indicates, "[the Court should] canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."

Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert denied, 464 U.S. 822 (1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972), cert denied, 409 U.S. 1039 (1972). See In re Handler, 386 B.R. at 420-21."

I will be more than happy to provide the Court with my databases, should I be requested to do so. If requested, however, I would like to modify the submission to protect the identity of the shareholders, or make arrangements that would provide that.

Thank you, once again, for your time and consideration.

Respectfully;
Jay P. Booth