UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X  Chapter 7
                                   :  Case No. 10-13647 (SMB)

In re:                             :

SPONGETECH DELIVERY              :
SYSTEMS INC.
                                   :
         Debtor                  :
------------------------------------------------------------X  Affidavit in Further Support

JAMES SASSER states as follows under penalty of perjury:

      1. As noted in my initial affidavit in support of this motion, I own more than 100 shares of Spongetech Delivery Systems Inc. ("Spongetech"), the debtor here. I recognize that I am not a lawyer and therefore cannot represent the entire universe of shareholders. My arguments are those of law, which the court would have to consider whether or not I brought them to its attention.

      2. I am submitting this affidavit:

          (a) In response to the reply of Kenneth Silverman ("Mr. Silverman" or "The Trustee"), in opposition to my motion; and

          (b)_ In opposition to his curious plan to "sell" the rights to pursue the "naked short sellers." I and other shareholders believe those sellers of those naked shorted shares should be required to cover them, which I believe would not only be beneficial to the "real" shareholders, but also infuse sufficient sums of money to put Spongetech back on its feet._And

          (c) In opposition to his plan to de-register Spongetech shares without shareholder approval

1

3. While these encompass three different documents — my motion seeking to force the Trustee to set aside substantial monies from any recovery to fund litigation to reclaim even greater sums, the Trustee's threat to "sell" the claims against the "naked short sellers" and his motion seeking approval of a settlement with the Security and Exchange Commission — I am responding to them simultaneously, because they overlap, and that because doing so in one piece will demonstrate that the Trustee's planned actions are contradictory, and that his position on the rights of the shareholders seems to change with each suggested resolution...sometimes within the same document.

4. It also appears that a more careful reading of the Order allowing him to hire another law firm to supposedly chase some claims will show that what has been approved is not a "contingency" arrangement but one in which the new counsel will be paid whether or not it succeeds, underscoring the need to reserve monies for litigation.

5. In his February 8th letter to shareholders, Mr. Silverman complained that his firm had not been paid a fee from the Spongetech bankruptcy. While this no doubt puts financial pressure on his firm, it is no excuse for proposed "solutions" which apparently have not been thought out and appear to be largely feints attempting to moot this motion. Further, Mr. Silverman's opposition papers are unresponsive to the principal questions raised in my motion. Most significantly, his arguments raise the concern that his opposition to setting aside a significant part of the recovery to chase down and recover from the "naked short sellers" may be motivated by a desire to have those funds available for his fee.

6. The Trustee has gone to great efforts, and dissipated funds of the Estate, for the principal purpose of mooting this motion. To do so, he has woven a tapestry that includes another law firm which he claims would recover only on a contingency basis to seek to recover "certain claims." In his motion seeking

2

approval of the firm's hiring and the resultant Order, what "certain claims" these are is not identified, but now for the first time he says it includes claims against the "naked short sellers. In the same breath he says those assets are worthless; he then purports to offer for sale the "worthless" claims that in other writings he asserts the estate does not own to sell.

7. He ignores a principal relief demanded in this motion: That if in fact Mr. Silverman is successful in selling certain of the firm's assets for $500,000, a portion of that recovery be put aside to finance actions to recover claims which I and other Spongetech shareholders believe, contrary to his opinion, are substantial and real.

8. Curiously, this flurry of activity comes on the eve of a pivotal event in the Spongetech bankruptcy. As pointed out in my initial affidavit and memorandum of law, a $6 million note payable to Spongetech is due and payable on June 25th, 11 days from now. My prior papers assert that the holder of that note is a going concern with deep pockets and that Spongetech should be able to recover from them. He makes no mention of this.

9. The omissions and misconceptions include these:

¶ Mr. Silverman had asked the court for approval for a sale of certain of Spongetech's assets which would result in a $500,000 recovery. The Trustee in opposing this motion compares it to one by other shareholders seeking to block that sale and as a consequence it should be denied. However, unlike the other shareholders, I did not ask the Bankruptcy court to block the sale, but rather to put aside some of the money to pursue what I believe will be a much larger recovery.

¶ In his opposition papers to my motion, Mr. Silverman states (in Paragraph 8) that the court "has made it abundantly clear to the...shareholders that they are free to pursue any claims they the

believe they possess against the 'naked short sellers....'" The court has made no such ruling, such claims belong to the Bankruptcy estate, and one of the points of my motion is to impel Mr. Silverman to pursue these.

¶ In his recent "Notice to Shareholders" Mr. Silverman states that he intends to put the right to pursue the "naked short sellers" up for auction on June 30th. However, Mr. Silverman has consistently insisted that the Bankruptcy estate does not own this claim, but rather that it belongs to the shareholders, raising the question of how the Trustee can put up for auction rights that he says belong to someone else.

¶ The Trustee asks the Bankruptcy court to approve his plan to de-register the stock. However, because Spongetech has more than 300 shareholders, the Trustee cannot do this without shareholder permission, and no vote has been sought and his proposed actions are inconsistent with Second Circuit precedents.

## THE $500,000 ASSET SALE AND THE APPOINTMENT OF REED COLLINS

10. The Trustee had asked the court for permission to sell about $500,000 in Spongetech assets. Two other shareholders, Messrs. Hubbard and Venkatesh, had asked this court to block that sale and their motions were denied. In his reply papers Mr. Silverman likens my motion to theirs and says it should be denied for the same reason.

11. That is not correct. My motion, which was brought in March, asked this court, if it approved the asset sale, to set aside an undetermined amount of that $500,000 recovery to pursue among other things the "naked short sellers" claims. Mr. Silverman has asserted that he cannot go after the millions of dollars

4

which could be recovered from the "naked short sellers" because the estate doesn't have the money. I contend that setting aside some of the $500,000 would provide that money.

12. On May 10th, 2011, six weeks after I filed this motion, Mr. Silverman asked the court to approve the appointment of another law firm, Reid Collins and Tsai, ("Reid Collins") to pursue claims against "various entities and individuals."

13. While there may be other purposes, it appears from the sequence of events that at least one motive for this step was an effort to moot this motion. However, neither the application nor the court's resulting order approving such employment of the Reid Collins firm identifies who those "various entities and individuals" might be.

14. In addition, his argument that Reid Collins won't be in line for any payments unless it recovers funds and thus there is no need to set aside funds for litigation is simply not true. [1]

15. His contention is based on his statement that "the Trustee and Reid Collins have agreed that the pursuit of the claims will be done on a strict contingency basis with no cost to the estate..." However, that is not what Judge Bernstein's order approving the retention of Reid Collins says. Its order permits payment to Reid Collins under Bankruptcy law §330 (a) (a) (A) which allows the law firm to bill for "reasonable compensation for actual" expenses.

16. It also doesn't matter what the Trustee and the law firm have agreed on, or what the firm's engagement letter says, because the Order states clearly that in

---

[1] The Reid Collins firm has also been retained by Mr. Silverman in other bankruptcies in which he is the trustee, for example, In re: Agape. In seeking court approval to hire Reid Collins for the *Agape* litigation, the Trustee included their contract. Here he does not, and the engagement letter does not matter anyhow, because the Order says it is superseded by the Order.

the event that the agreement between the Trustee and Reid Collin are different, the Order controls. [2]

17. As noted in my opening affidavit, the payment of $500,000 to the Spongetech estate would provide a substantial bankroll; presumably the Trustee believes this could fairly be applied to the fees he no doubt feels he and his law firm are owed.

18. But this aside, the Order affirming the hiring of the Reid Collins firm allows it to be paid under Bankruptcy §§ 330 and 331. As such, funds must be set aside to allow the law firm to aggressively pursue the naked short sellers...if in fact they are among the "various entities and individuals" Mr. Silverman has hired them to litigate.

19. This raises another pregnant question which is evaded in Mr. Silverman's papers opposing this motion. The Hubbard and Venkatesh motions were denied by the court and at that time Judge Bernstein approved the asset sale to be held in an auction in the Trustee's offices on April 11th, 2011. However, more than two months later, there has been no disclosure by the Trustee as to whether or not that sale, or any part of it, has been completed.

20. This raises the specter that perhaps the Trustee is sitting on that sale until he sees the outcome of this motion, and whether he will be have to, as I request, be required to utilize some of these funds to pursue the "naked short sellers."

21. The Trustee has a "duty to appear and prosecute ...and action on behalf of the estate..." <u>Gramil Weaving Vs. Raindeer Fabrics,</u> 185 F. 2d 537. (Second

---

[2] It is pertinent that Judge Bernstein did not see the actual engagement letter, but only the Trustee's self-serving description of it. Since Mr. Silverman prepared the actual Order which was signed, it is also possible that Judge Bernstein did not realize that it differs from what the Trustee says the payment arrangements are.

Circuit 1950) including "All legal or equitable interests of the Debtor."
Bankruptcy Law §541 (a) (1).

22, Mr. Silverman's excuses that he has not done so are that the Estate lacks the funds and that the "naked short seller" claims are "tenuous." A group of shareholders offered to underwrite the necessary research and was ignored, and his statement that Reid Collins doesn't think much of the claim, without a written opinion from the law firm, is nothing more than hearsay suiting the Trustee's purpose. [3]

23. Therefore, the court should require that a reasonable portion of the $500,000 asset sale, if and when it is completed, be set aside for legal fees; as a practical matter, a law firm assured its reasonable expenses will be paid is far more likely to aggressively pursue the claims if it is assured there is a pot of gold at the end of the rainbow.

**THE TRUSTEE SAYS ON THE ONE HAND THAT HE PLANS TO AUCTION OFF THE RIGHTS TO LITIGATE AGAINST THE NAKED SHORT SELLERS, AND ON THE OTHER, THAT THE SHAREHOLDERS OWN THAT RIGHT**

24. Mr. Silverman's plan to auction off rights to collect from the naked short sellers is contradicted by his own statements, and raises the question of how the Estate can sell rights which it says it does not own. This suggestion appears to be, principally another clumsy scheme to moot this motion.

25. In his papers opposing this particular motion, Mr. Silverman states:
"The Court has made it abundantly clear to the Debtor's shareholders that they are free to pursue any claims that they believe they possess against any 'naked short sellers' as long as they act within the boundaries of the

---

[3] Any claim by the Trustee that such an opinion, if one in fact exists, is protected by attorney client privilege, has been extinguished by Mr. Silverman's description of it.

Bankruptcy code and other applicable law. They have
failed to do so."

26. This statement is inaccurate in two regards. First, that's not what the Court said. And second, some shareholders, as will be seen, have offered to finance such research and Mr. Silverman, perplexingly, has not taken advantage of the offer.

27. In stating that the court has made it clear that the shareholders "are free to pursue any claims" Mr. Silverman is transparently referring to is Judge Bernstein's "Memorandum and Order Regarding Shareholder Requests for Various Forms of Relief" dated Sept. 23rd, 2010. What that Order actually says is:
"Under the circumstances it would be inappropriate to force the creditors....to shoulder the cost of the investigation which is sought. The shareholders may of course, conduct an investigation at their own expense." [Emphasis added]

28. The plain meaning of what Judge Bernstein wrote was that the shareholders could finance their own *investigation* and not as the Trustee would have it, "pursue claims" through litigation.

29. Significantly, certain shareholders have offered to finance the necessary discovery to pursue the 'naked short sellers' and the Trustee has ignored them.

30. Attached as Exhibit A of this affidavit is a letter sent to Judge Bernstein on May 3rd 2011 by Susan Hunt Levin on behalf of the SPNG Shareholder Group LLC (SSGL) regarding "its offer to pay the Trustee to obtain information" which would be necessary to pin down the "naked short sellers."

31. In that letter, Ms. Levin details her group's efforts to pay the Trustee's expenses to "obtain the NOBO list, OBO count, Securities Position Report and Share Range Report. Payment, which would be wired in advance, would cover

both the outside costs and the Trustee's time in obtaining the reports – resulting in no costs to the estate."

32. According to Ms. Levin, the Trustee first denied the request and then never replied to subsequent requests nor its copy of this letter to fund the investigation suggested by Judge Bernstein in his Order.

33. While the court may have encouraged the shareholders to *investigate* the naked shorts on their own, this can be accomplished much more efficiently by the Trustee. He has some of the necessary documents already in his files, and unlike individual shareholders, has *the right of subpoena which the shareholders do not.* Since the SSGL is prepared to pay for the investigation, why would the Trustee ignore the offer?

34. This is only one of numerous puzzling aspects in the Trustee's statements and actions.

35. As described earlier, Mr. Silverman has misquoted the Court when he says the shareholders can pursue the "naked short sellers" on their own, and he has said the same thing in his own writing. In his February 3rd, 2011 memo to the shareholders he writes in the third person:

"As recognized by Bankruptcy Judge Bernstein, and as provided by the Bankruptcy code, as Trustee, Mr. Silverman's authority only extends to the marshaling and liquidation of Spongetech's assets...Mr. Silverman simply does not have the authority to address the myriad ...securities issues raised by the conduct of Spongetech's former officers regarding the sale and/or transfer of real or illusory shares of stock."

36. Mr. Silverman repeats this sort of inaccurate information once again in his most recent "NOTICE TO SHAREHOLDERS" (Exhibit B) in which he says that he is going to auction off the right to pursue the "naked short sellers" on June 30th, in which he writes:

"The Trustee has also consistently contended that the alleged claims against the NSS...actually belong to individual shareholders who were impacted by those naked short sales. Furthermore, the trustee has maintained that the shareholders are free to pursue potential claims...at their own expense."

37. This of course is <u>not</u> what the trustee has "consistently" asserted, is not what the Bankruptcy court had ruled, and is inconsistent with black type law.

38. Having stated in his "NOTICE TO SHAREHOLDERS" that claims again the NSS belong to the shareholders and not the estate, Mr. Silverman states in the very next paragraph that he will be "accepting and evaluating any **serious** offer to purchase the claims held by the Debtor against unknown individuals and entities that engaged in 'naked short sales' of the Debtor's common shares...." [bold face and underline in the original].

39. More simply put, the Trustee purports to offer for sale claims which he says do not belong to the estate but to the shareholders. He of course cannot sell those claims unless the estate owns them. Should a party buy them, and subsequently learn they did not belong to the Estate, as Mr. Silverman says when it is convenient, that transaction would open the Estate to serious fraud liability.

40. As demonstrated above, the Trustee's position on key issue shifts every time he confronts a different issue. Sometimes the Estate can own the right to make such claims, so he can sell them, and sometimes they belong to the shareholders so they should pursue them. He says monies should not be set aside for researching and litigating these claims, because Reid Collins believes that "the claims against the NSS, if they exist at all, appear to be tenuous at best and would be expensive to prosecute." This is of course Mr. Silverman's opinion not supported by any statement from Reid Collins and is merely self-serving hearsay.

41. As demanded in this motion, if and when the $500,000 asset sale is completed, a substantial amount should be set aside for the cost of litigating Spongetech's claims against the "Naked Short Sellers," and Reid Collins should either be directed to pursue them aggressively, or clarify Silverman's hearsay recital of their position that the issue is "tenuous."

43. While normally a Trustee's obligation is to the creditors, and these actions are being demanded by the shareholders, who are not creditors, what I suggest is not incompatible with the interests of those creditors and will benefit them equally.

**THE TRUSTEE DOES NOT HAVE THE AUTHORITY TO DE-REGISTER THE COMPANY WITHOUT THE APPROVAL OF ITS SHAREHOLDERS AND WHAT HE PROPOSES TO DO IS INCONSISTENT WITH PRECEDENTS IN THIS CIRCUIT**

44. Mr. Silverman says he has reached a deal with the Securities and Exchange Commission to de-register the Spongetech shares. What he is suggesting is normally termed "going dark." Whether or not the SEC would do it on its own initiative, the trustee appears to have no authority to do so without a vote of the shareholders, because there are far more than the 300 threshold. *Cf.* §§ 12 (g) and 15 (d).

45. That aside, Mr. Silverman's proposed actions appear to be hasty and contrary to Second Circuit precedent.

46. In support of his motion seeking approval of his proposal to settle proceedings brought by the SEC, the Trustee principally relied upon In re Iridium, 478 F. 3rd 452. (Second Circuit, 2006).

11

47. In that precedent, the Court of Appeals outlined seven factors to be considered by the court in determining whether to approve a compromise or settlement. These are called "The Iridium Criteria" and are as follows:

"i. the balance between the litigation's possibilities of success and the settlement's present and future benefits;

ii. The likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment if the settlement is not approved;

iii. The paramount interest of the creditors, including the proportion of class members who do not object to or who affirmatively support the settlement;

iv. whether other parties in interest support the settlement;

v. the competency and experience of the counsel who support the proposed settlement;

vi. the relative benefits to be received by individuals or groups within the class; and

vii. The extent to which the settlement is the product of arms length bargaining."

Iridium Operating LLC, 478 F.3d at 462.

48. Mr. Silverman's actions fail each of these tests.

49. As far as the first test, the "balance between the litigation's possibility of success and the settlement's present and future benefits" is concerned:

a. the SEC has proved nothing against the company, and it is currently unknown if the $6 million note will be received, it is premature to know if this criteria applies.

b. There is no reason to rush to this settlement with the SEC except for the convenience of the Trustee. The SEC has not even filed for the de-registration of shares. Per the SECURITIES EXCHANGE ACT OF 1934, § 12 -- Registration Requirements for Securities, 12(j): "j. Denial, suspension, or revocation of registration; notice and hearing:

The Commission is authorized, by order, as it deems necessary or appropriate for the protection of investors to deny, to suspend the effective date of, to suspend for a period not exceeding twelve months, or to revoke the registration of a security, if the Commission finds, on the record after notice and opportunity for hearing, that the issuer, of such security has failed to comply with any provision of this title or the rules and regulations thereunder." No notice or opportunity for hearing has been made.

c. §12d2-2(c) of the same Act states:

"The issuer of a class of securities listed on a national securities exchange and/or registered under section 12(b) of the Act may file an application on Form 25 to notify the Commission of its withdrawal of such securities from listing on such national securities exchange and its intention to withdraw the securities from registration under section 12(b) of the Act." An issuer filing Form 25 under this paragraph must satisfy the requirements in paragraph (c) (2) of this section and represent on the Form 25 that such requirements have been met:

(i) The issuer must comply with all applicable laws in effect in the state in which it is incorporated and with the national securities exchange's rules governing an issuer's voluntary withdrawal of a class of securities from listing and/or registration.

(ii) No fewer than 10 days before the issuer files an application on Form 25 with the Commission, the issuer must provide written notice to the national securities exchange of its determination to withdraw the class of securities from listing and/or registration on such exchange. Such written notice must set forth a description of the security involved,

together with a statement of all material facts relating to the reasons for withdrawal from listing and/or registration.

(iii) Contemporaneous with providing written notice to the exchange of its intent to withdraw a class of securities from listing and/or registration, the issuer must publish notice of such

50. Mr. Silverman has not complied with any of these requirements.

51. Regarding the second criteria, "the likelihood of complex and protracted litigation" the bulk of the SEC's case is against the individual defendants and not the company, and as previously stated, nothing has been proven to date and this determination is premature at best.

52. As far as the third criteria is concerned, "iii. the paramount interest of the creditors, including the proportion of class members who do not object to or who affirmatively support the settlement"

a. The creditors in the Spongetech bankruptcy have been totally silent. The only time any creditors made themselves known in court was during the hearing regarding the appointment of Trustee Hays. To date, no creditors committee has been formed and it is unclear if the Trustee even contacted the creditors over this settlement agreement to find out if there was support or objection.

b. It is still unproven by the SEC or the Spongetech Trustee if the company is in possession of shares. If the company has shares and if there is a naked short position, the Spongetech shares would have value and could potentially provide value to pay back creditors. This has neither been researched by the Trustee (as he has not obtained the share data) nor presented to the creditors.

53. The fourth criterion is whether "other parties in interest support the settlement." Although in a bankruptcy proceeding, creditors are "first in line,"

shareholders are still "in the line" and are thus parties in interest. No shareholder would support the de-registration of the stock, so clearly this criteria is not met.

54.     The fifth criterion is "the competency and experience of the counsel who support the proposed settlement." I believe that the analysis of the Trustee's actions earlier in this memorandum, and Mr. Silverman's unwillingness to confront the short-selling claims, demonstrate neither he nor his counsel understand the topic of naked short selling. Despite the ability to easily and at no cost to the Estate obtain the share count information, they have refused to do so. They maintain that they have hired Securities experts, but the fact is that without the relevant share count data in their possession, a Securities expert would not be able to determine if a naked short position existed or not. This alone demonstrates incompetency to determine whether or not the shares should be de-registered.

55.     Regarding the sixth criteria, "the relative benefits to be received by individuals or groups within the class;" clearly there is no benefit to the shareholders. De-registration of the stock opens the door to cancellation of the shares and a total financial loss for all shareholders of Spongetech. More important, the inability to gather pertinent information on the share structure hinders the Estate's ability to equitably distribute funds to the shareholders should Reid Collins be successful in any of the forthcoming litigations.

56. As far as the seventh criteria, "the extent to which the settlement is the product of arm's length bargaining" is concerned:

    a. The Trustee routinely works with the SEC and generates revenues for his business from this work.

b. The Trustee claims to have already run up expenses in the Spongetech case exceeding $650,000 and may be uncertain how or when he will be compensated for these costs.

c. The Trustee complains constantly about being bothered by shareholders. It is wholly possible, if not likely, that the Trustee would like to see the rapid conclusion of the Spongetech bankruptcy, together with his ability to disburse the $500,000 sales income without any restriction. His ability to cancel the shares would put an end to having to deal with the shareholders.

d. The Trustee has repeatedly refused and/or ignored requests to obtain share count information, despite having been offered to pay for obtaining the same. This, combined with his rush to offer de-registration that has not been formally filed for by the SEC, raises significant questions about whether the settlement is indeed a "product of arm's length bargaining" or if he is merely supporting the SEC's wishes.

57. Finally, in Paragraph 22 of his argument, the Trustee states:
"Moreover, to the extent that the Consent defers the imposition of a fine, civil penalty upon or disgorgement by the Debtor to a future date, it enables the Trustee to conserve resources until such time as the SEC Action has a monetary impact on the estate, if ever."

58. The SEC case is years from going into court, the SEC accusations are directed not against the company itself but former officers, and is unclear what, if any, liabilities the corporation would incur. Additionally, the $6 million note is days away from coming due and the possibility exists that the Estate will receive considerable resources from it, a potential windfall the Trustee has consistently failed to publicly address.

## SUMMARY AND CONCLUSION

59. My motion was filed in March. There has been significant water under the bridge since then. The trustee has hired a law firm to pursue "certain" claims but what these are seems variable. His motion seeking approval of their hiring doesn't identify what claims the firm is supposed to be pursuing, but in his affirmation in opposition to this motion he implies (but does not actually say) that the "naked short sellers" is one of them. In the next breath, in a different context, he says the law firm thinks the NSS claims are "tenuous."

60. When it suits him, the trustee says the claims against those NSS belong to the shareholders, not the estate, and it's the shareholders who should be pursuing this. In another document, he implies the claims belong to the estate and Reid Collins is going after them. In yet another document he says once again that the claims belong to the shareholders, but in the very next paragraph, of that document offers to sell them.

61. All of this may be legitimate, or it might just be an effort to make it appear that this motion is moot; giving him a free hand to dispense the $500,000 sale proceeds.

62. In the meantime, he avoids the issue of whether or not the sales of certain assets for $500,000 has taken place, and what he's going to do with it if and when it does close and makes no mention of the impending $6 million note which comes due in less than two weeks.

63. Finally, he avoided the most pregnant question of all — why is he in such a rush to de-register the company when a $6 million note is due in a matter of days from an entity which I have asserted has the assets to pay it, a sum which I believe will make the Spongetech estate solvent again.

64. It has always been my position, in which I believe I am joined by the other shareholders, that Spongetech was a viable company and the trustee moved

17

too quickly to kill it off, by changing its filing from a voluntary Chapter 11 to one under Chapter 7. De-registering, dissipating the $500,000 from the asset sale, "auctioning off" the claims against the NSS, and failing to collect the $6 million due from a note on June 26th would put the nails in Spongetech's coffin.

65. The statements of fact in this affidavit have been made under penalty of perjury under the U.S. Code.

WHEREFORE, I ask that:

¶ The court order the Trustee to fully investigate the claims against former officers and employees and others as outlined in my first affidavit, and in doing so, to prosecute those claims to benefit the estate;

¶ That if and when the $500,000 asset sale is finalized, the Trustee be required to set aside a sum to finance research and litigation on those claims, and the potential claims against the "naked short sellers";

¶ That the Trustee's plan to auction off the potential claims against "naked short sellers" be barred because in doing so he has represented that the Estate does not own them, and as such he is opening the door for further litigation from a potential buyer if the sale is fraudulent;

¶ That the court order the Trustee accept the SSGL offer to pay for the acquisition of share count information and obtain the requested information on behalf of shareholders;

¶ That his motion seeking approval of a motion to "settle" with the SEC be denied, because he has no authority to do this without shareholder approval and his plan does not meet the so-called *Iridium* standards.

¶ And such other and further relief as the court deems just.

Respectfully,

James Sasser          Dated: June 14, 2011

18

# EXHIBIT A

Susan Hunt Levin

May 3, 2011

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
Southern District of New York
One Bowling Green
New York, New York 10004-1408

Re: Spongetech Delivery Systems, Inc.
Case No. 10-13647(SMB)

Dear Judge Bernstein,

This letter is being written regarding the SPNG Shareholder Group LLC, a North Carolina corporation
founded in September 2010 by attorney Darrell Whitley, and its offer to pay the Trustee to obtain
information regarding the share count.

Although you may not have heard of us by our proper name, you have heard of us referred to in your
court as "vultures" by the Estate's lead counsel, Mr. Anthony Acampora, on both March 3 and April 7,
2011. The fact is, we have conducted ourselves quietly and professionally. With zero exposure message
boards, we organized and raised hundreds of thousands of dollars, and all communications with the
Trustee and his staff on behalf of the LLC have been conducted through our attorney—until last week.
Out of desperation, I sent two emails last week in a final effort to gain some cooperation from the
Trustee's staff, and as those emails have gone unanswered, I am now writing to you.

On April 16, 2011, Mr. Whitley sent an offer to Mr. Acampora in which the LLC would pay the Trustee to
obtain the NOBO list, OBO count, Securities Position Report and Share Range Report. Payment, which
would be wired in advance, would cover both the outside costs and the Trustee's time in obtaining the
reports—resulting in no costs to the Estate. The offer contained the one-page form required, line-by-line
information on how to fill out the form, and a detailed cost estimate for the outside costs. The costs
were based on information collected by me from Broadridge Financial Solutions, Inc., the company that
issues the NOBO list and that will provide the other reports at no additional charge if purchasing the
NOBO list.

We are talking about the time required to provide wiring instructions and to fill out/submit a one-page
form—not something that would burden the Trustee's workload, and he would be compensated for his
time. He would also receive copies of the information and could do with them whatever he wanted.

Our reason for requesting these reports was to enable us to perform due diligence in regard to possibly
acquiring the Spongetech Delivery Systems, Inc. (SDSI) corporate shell to preserve the share structure.

There is no way to begin assessing or investigate the share structure without this information. We have to go through the Estate to obtain this information. And, as Your Honor suggested in your September 23, 2010 order, we are seeking to obtain this information at our "own expense."

On Monday, April 25, Mr. Whitley, following a phone conversation with Mr. Acampora, emailed me saying that the Trustee would "not entertain the idea of getting any shareholder list until he has resolved the issues of the inventory, etc. And then he is not certain if it is an action he would do with our involvement." (Quote is from Mr. Whitley, not Mr. Acampora.)

Based on that information, on Wednesday, April 27, I emailed Mr. Acampora asking for an additional report (from Worldwide Stock Transfer) and that the Trustee reconsider our request. When I did not receive any response by Friday, April 29, I wrote again, this time copying Trustee Silverman and Mr. Brett Silverman, and including Mr. Whitley's April 16 emails and mine.

In my emails, I stated:

"According to Mr. Whitley, you also mentioned uncertainty as to whether or not the shell would be offered for sale at some time in the future due to the possibility that the company may become de-registered. Under this line of thinking, all the more reason to obtain the information as soon as possible. If the company becomes deregistered, the shell loses 100% of its value that could otherwise be used to compensate creditors."

On March 3, Mr. Acampora stated in court, "The public shell is not up for sale at the moment." On April 7, he stated, "The company has been delisted. It's sliding on its way into deregistration." It was this second statement that made the LLC quickly move forward with its offer. Unfortunately, we do not know what Mr. Acampora was basing this statement on; whether on general knowledge or perhaps even something he had been told by the Securities and Exchange Commission (SEC). Regardless, it scared us.

Additionally, it raises a very important question — if the Trustee is aware of this possibility, why is he dragging his feet regarding selling the shell before its value is lost to the creditors?

Coincidentally, on Friday April 29, I received an email regarding a message board post by Mr. James Sasser who has a motion before your Court. He apparently posted that Mr. Brett Silverman had agreed to meet with him the day before the May hearing "to discuss how we can proceed to get this info," i.e., information related to a share count. In a follow-up post, Mr. Sasser stated, "He [Mr. Brett Silverman] seemed willing but wanted to know how we would do it and how it would benefit the company."

As this meeting will not take place for three weeks (over six weeks after Mr. Acampora's "deregistration" comment and over five weeks after our offer), I can only characterize this as more "foot dragging" — unnecessary delays that risk the loss of a potentially valuable asset to the Estate and its creditors.

"Foot dragging" seems to be a recurring problem with the Estate, and brings me back to Mr. Acampora's "vultures" comments regarding the LLC's $25,000 bid. Here are some things he failed to mention.

On October 26, 2010, while the Estate was in Chapter 11, the LLC submitted a written plan and detailed financials regarding the acquisition of SDSI—a plan that would transfer the share structure intact and continue company operations. It included an initial purchase price of $250,000 and a viable business plan to pay back creditors $1,500,000 over five years. After answering the Trustee's questions, on or about November 1 we were told we would need to hire a NY bankruptcy attorney and submit a formal reorganization plan. No sooner had we begun discussions with a NY BK attorney, than on November 4, Trustee Silverman moved the Court to convert SDSI to Chapter 7. (Interestingly, the Trustee's website states that "Despite several months of discussions, not a single individual, group or entity stepped forward with a viable plan (in writing or otherwise) to salvage Spongetech's business. As a result, Mr. Silverman had no choice but to seek to convert Spongetech's case to a chapter 7 liquidation.")

We were then told that it would be possible to buy the company in Chapter 7 and take it back into Chapter 11 reorganization, so we continued our efforts. Next we were told that the Trustee would sell "certain assets" first, and we waited about six weeks for an assets list. On December 20, 2010, we received a sloppy cut & paste pdf of a trademarks/tradenames list compiled on September 16, 2010 (without Spongetech patents D610,753 and D596,023) and an inventory list printed out August 26, 2010. There was no information on the liens (a matter of public record from the Dicon bankruptcy filings), what inventory had already been sold to Wayne Celia's company, etc. It was unprofessional and ridiculous.

Additionally, no mention was made of the molds for making the products or another extremely valuable asset: the process/formulae for making the different infused sponges. Regarding the molds, the company purportedly owned approximately 50 molds that cost about $20,000 each to manufacture. Although I have not verified this information, I do know that the molds are required to make the product and in order for our plan to have been successful, we would have required the molds. Regarding the process/formulae for making the different infused sponges. SDSI made sponges using a proprietary process, materials from different manufacturers and specific formulae for the different sponges—once again a prerequisite for our plan and detailed as such. The best analogy I can give is The Coca Cola Company. Without the formula for Coca Cola, the company's value is significantly diminished. Yet Trustee Silverman did not see fit to ensure that this information was documented and included as an asset for sale. His recent Settlement Agreement with the Dicon Estate allowed the Dicon Estate and/or Wayne Celia's company to basically walk away with these assets providing no financial benefit to the Spongetech Estate or its creditors.

It is as if the Trustee never bothered to figure out what the company made or how they made it. Regardless, once having read our plan in late October, it should have been immediately clear to him.

"Foot dragging" allowed these assets to disappear as part of the Dicon settlement, to the detriment of

the creditors. "Foot dragging" has resulted in the Trustee's inability to provide an inventory list after 9 months as evidenced by the pre-sale Pacer filings and the Estate still needing to clear up inventory issues. And now it appears that "foot dragging" may allow the public shell and its potential value to creditors to disappear as well.

In closing, I would ask that you please do whatever you can to encourage or direct the Trustee to:

• Immediately proceed in obtaining the requested data, whether via the LLC's offer or some other means

• Tell the Court why the public shell is not for sale. If it is because the Trustee intends to pursue the naked short question on behalf of the Estate, that is fine and something the LLC would support. But to wait another three weeks to begin discussions on how the data would be gathered and how it would benefit the company—in light of the possibility of deregistration, this is totally unacceptable and irresponsible.

As I'm sure you know, a vulture, circles above or even sits next to a dying animal, waiting to pick apart its carcass. Our LLC, since its inception, has been working to save a dying company, its creditors and shareholders. Although I cannot condone name-calling, I believe it is clear that we are not the ones waiting around for the company to be deregistered and die.

Thank you for what will hopefully be your prompt attention in this matter.

Sincerely,

Susan Hunt Levin/s/

Susan Hunt Levin
A SPNG Shareholder and a Founding/Contributing member of SPNG Shareholder Group, LLC

# EXHIBIT B

## NOTICE TO SHAREHOLDERS

A portion of individuals holding equity positions in Spongetech Delivery Systems, Inc. (the "Debtor") have vigorously expressed their desire that the Trustee pursue claims against alleged "naked short sellers" (collectively, the "NSS") amongst other alleged or potential claims the Debtor may possess. Please allow this Notice to provide a brief explanation of the current status of the bankruptcy proceeding and of the Trustee's future intentions.

On May 19, 2011, the Bankruptcy Court entered an Order approving the Trustee's employment of Reid Collins & Tsai LLP ("Reid Collins") as special litigation counsel. Reid Collins will be pursuing certain of the Debtor's potential litigation claims against various entities and individuals, including but not limited to, the Debtor's alleged interest in a loan entered into between RM Enterprises, Inc. and Business Talk Radio, on a strict contingency fee basis. Reid Collins has already reviewed all of the Debtor's potential claims, and has elected not to pursue certain of them because they are (a) unfounded, (b) too costly to pursue in light of the potential net benefit to the estate, or (c) for various other reasons.

The Trustee has repeatedly stated, and it is an absolute fact, that the Debtor cannot defend, and has no defenses to the claims asserted against the Debtor, by the Securities and Exchange Commission (the "Commission"). Moreover, de-registration of the Debtor's common shares, regardless of the Trustee's consent, is inevitable. The stipulations (the "Stipulations") that the Trustee entered into with the Commission circumvent and cap certain administrative expenses that have accumulated and will continue to accumulate against the Debtor's estate.

As you know, the Trustee has consistently taken the position that the rehabilitation of the Debtor's public shell does not represent a viable source of recovery to the Debtor's estate or its creditors, because of, among other issues: (i) the costs associated with bringing the required filings (i.e. 10k's and 10Q's) current; (ii) the fact that there is no viable business; and (iii) other related obstacles associated with such rehabilitation. Separate from those rehabilitation needs, the Trustee was informed that he cannot solicit offers for the public shell without running afoul of applicable securities laws.

The Trustee has also consistently contended that the alleged claims against the NSS, if they exist at all, actually belong directly to individual shareholders who were impacted by those naked short sales. Furthermore, the Trustee has maintained that the shareholders are free to pursue potential claims against the NSS at their own expense. It is the opinion of the Trustee's retained professionals, including Reid Collins, that the Debtor's claims against alleged the NSS, if they exist at all, appear to be tenuous at best, and would be expensive to prosecute. Moreover, suits against the NSS would not likely result in a significant recovery to the Debtor's creditors.

**THEREFORE, PLEASE TAKE NOTICE THAT,** the Trustee will be accepting and evaluating any **serious** offer to purchase the alleged claims purportedly held by the Debtor against certain unknown individuals and entities that engaged in alleged "naked short sales" of the Debtor's common shares, at unspecified times, in unspecified quantities and to unspecified individuals or entities (the "Alleged NSS Claims").

**PLEASE TAKE FURTHER NOTICE THAT,** with regard to your potential interest in the Alleged NSS Claims, the Trustee cannot evaluate the seriousness of that interest without additional information. Therefore, any offer you may make **must** (a) be in writing, (b) offer a substantial monetary benefit to Spongetech's estate, (c) be "as is,

where is and with all faults" and with no representations or warranties by the Trustee of any kind or nature, (d) must recognize the speculative nature of the transactions and accept full responsibility therefor, (e) provide acknowledgment that the Trustee assumes no, and expressly disclaims any, obligation to assist the successful bidder in any regard, (f) be accompanied by an opinion of competent legal counsel expressing an opinion concerning, among other things, the structure and viability of any such purchase, (g) be accompanied by evidence, such as current bank statements or a letter from a financial institution evidencing the ability to fully fund and close on any offer, (h) be accompanied by a good faith deposit in the sum of 10% of the offer in readily available funds to be held in escrow pending the approval of the sale which would be refundable in the event that you were not the successful bidder (the "Deposit"), and (i) be received by the Trustee *no later* than *June 30, 2011 at 4:00 p.m. (EST)* **(the "Expiration Date")**.

**PLEASE TAKE FURTHER NOTICE THAT,** *neither the Trustee nor his counsel can offer any legal or other advice regarding the nature or content of your offer, or regarding whether to purchase the Alleged NSS Claims.*

**PLEASE TAKE FURTHER NOTICE THAT,** extension of the Expiration Date can be obtained from the Trustee, at the Trustee's **sole** discretion, and **only** upon the showing of **serious** intent to make an offer, including but not limited to delivery of the Deposit.

**PLEASE TAKE FURTHER NOTICE THAT,** any sale of the Alleged NSS Claims, will, of course, (a) be conducted in accordance with the provisions of the United States Bankruptcy Code and applicable securities laws, if any, (b) be subject to auction procedures to be agreed upon between the Trustee and any stalking horse bidder and (c) be subject to approval by Judge Bernstein.

**PLEASE TAKE FURTHER NOTICE THAT,** the Trustee reserves his right to evaluate each offer, if any, and make a determination regarding its viability and benefit to the estate and also reserves his right to reject any offers in his business judgment.

*PLEASE BE GUIDED ACCORDINGLY.*